(Decided 4th May, 1882.)

---

JACOB MYERS, DWIGHT E. LYMAN and RICHARD J. GITTINGS. Administrators, with the will annexed, of GEORGE PRESSTMAN, deceased *vs.* JOHN SILLJACKS.

*Obligation of Assignee of a Term to pay rent—Lease with right of renewal— Where the Original possession is Rightful, it is Presumed to Continue in accordance with the Title under which it commenced—Failure by Landlord to demand Rent— When a Court of equity will Decree a Specific performance of the Covenant of Renewal in a lease— When Equity will not enforce the Specific execution of the Covenant of Renewal in a lease.*

It is well settled that by accepting the assignment of a term, and entering into possession of the land, the assignee subjects himself to

Myers, *et al.*, Adm'rs of Presstman *vs.* Silljacks.

all the covenants that run with the land, including that for the payment of rent.

Where the original possession has commenced rightfully, under a lease for a certain and definite term, with right of renewal, nothing is to be presumed to make a continuance of the possession, during the term, by those holding in succession under the original lessee, wrongful or adverse. In such case there must be proof of an open, notorious disclaimer of all holding under the landlord's title, and an adverse claim set up that would amount to a disseisin in order to rebut the presumption that the possession has been in accordance with the title under which it commenced.

Where the relation of landlord and tenant is once established, as under a lease for ninety-nine years, renewable forever, the mere fact that the landlord has failed to demand the rent, will not justify the presumption that he has released or extinguished his right to it under the lease.

A Court of equity will, in a proper case, and upon seasonable application, in the exercise of an established jurisdiction, decree specific performance of the covenant to renew a lease, though the term has expired, and the party has failed or neglected to apply for renewal, according to the terms of the covenant. In such case, time is not regarded as of the essence of the contract, and a Court of equity looks rather to the objects and intention of the parties, than to the strict letter of the contract.

A Court of equity will not enforce the specific execution of a covenant for renewal in a lease for the term of ninety-nine years, renewable for ever, where nearly twelve years were allowed to elapse after the expiration of the term before application was made, and the complainant had openly repudiated all obligations and relations as tenant, and had persistently asserted since the expiration of the lease, an adverse title to the lot in himself as against the owner of the reversion. In such case a Court of equity has no hesitation in refusing relief.

APPEAL from the Circuit Court of Baltimore City.

The bill of complaint in this case filed on the 18th of February, 1880, by George Presstman against John Silljacks, sought to obtain the specific execution of the covenant

of renewal contained in a lease for ninety-nine years, renewable forever, from Ann Fell to Alexander McMechen, dated the 5th of July, 1769. On the 8th of November, 1880, the death of the complainant was suggested, and his administrators, with the will annexed, were admitted parties complainant in his stead. The Court (DOBBIN, J.,) passed a decree dismissing the bill, being of opinion that the complainant had not only been guilty of *laches* in omitting to claim a renewal within a reasonable time, but had maintained an active resistance to his landlord, which deprived him of all claim to favorable consideration. From the decree dismissing the bill, the present appeal was taken. The case is further stated in the opinion of this Court.

The cause was argued before STONE, GRASON, MILLER, ALVEY, ROBINSON, IRVING and RITCHIE, J.

*Julian I. Alexander, Orville Horwitz,* and *Benjamin C. Presstman,* for the appellants.

*John E. Semmes,* and *John H. B. Latrobe,* for the appellee.

ALVEY, J., delivered the opinion of the Court.

This suit was instituted to enforce specific execution of a covenant for renewal of a lease, for the term of ninety-nine years.

A large portion of the matter brought forward in the present case, as affording ground for relief, and which was made the subject of elaborate argument at bar, was really involved, and in fact considered by this Court, in the determination of the action at law between the same parties, and in respect to the same property now the subject of controversy; and the principles of the decision then made, so far as the legal rights of the parties are involved, we

shall regard as in all respects binding and conclusive in the decision of this case.

In the case of *Presstman vs. Silljacks*, 52 *Md.*, 647, the case to which we refer, this Court held that Presstman had acquired, by the conveyances exhibited and relied on by him, no other or greater estate in lot No. 125, the subject of controversy, than the right to the unexpired term therein, created by the lease from Ann Fell to Alexander McMechen, dated July 5th, 1769. It was also held, that the fee simple estate in lot No. 125 had been acquired, and was then held, by Silljacks; and that such estate was lawfully acquired by him, notwithstanding his former relation to Presstman as tenant of such unexpired term; the purchase of the fee by Silljacks having been made after the complete expiration of the term, and the consequent termination of Presstman's estate.

The lease from Fell to McMechen, bearing date the 5th of July, 1769, was for the term of ninety-nine years in three adjacent lots, Nos. 123, 124 and 125, at an entire annual rent of £10. 10s. The term expired on the 4th of July, 1868. The lease contained the usual covenants found in leases made for lots in Baltimore at the time, and such covenants appear to be in all respects similar to those contained in the lease involved in the case of *Banks vs. Haskie*, 45 *Md.*, 207. The lessee for himself, and for his assigns, covenanted that he or they would well and truly pay each year the rent reserved, to the lessor, her heirs and assigns; and that it should be lawful for the lessor, her heirs or assigns, to distrain in and upon any part of the demised premises for the rent reserved, upon non-payment thereof. The lessor then, for herself, her heirs and assigns, convenanted with the lessee, his personal representatives and assigns, that she, her heirs or assigns, would, upon the request, and at the cost and charge of the lessee, his representatives or assigns, and upon payment or tender of the sum of £10. 10s., as and

for a fine for a renewal, "*at any time during the con-tinuance of this present demise,* make and execute to him the said Alexander McMechen, his executors, &c. or assigns, so requesting and paying, or tendering as afore-said, a lease or demise of the said demised premises, for ninety-nine years, to take effect and commence at the end of the term hereby demised, at and upon the same rent, and with and under the like covenants, provisos, and agreements, as are herein contained, *so that this present demise shall and may be renewable and renewed forever."*

It is admitted that lot No. 123 was subsequently assigned by McMechen, subject to an apportioned rent of £3. 10s.; and that afterwards this lot was surrendered to William Fell, who was then entitled to the reversion. This left the other two lots, Nos. 124 and 125, subject to an entire annual rent of £7; the entire rent of the three lots having been thus apportioned, with what would appear to have been the assent of the reversioner.

In 1774, McMechen, the original lessee, assigned one-half of lot No. 124 to Basil Lucas, subject to a rent of £3. 10s., and the other half of that lot he assigned to William Morris, subject to a like rent of £3. 10s.; and, in both of these assignments, the assignees covenanted to pay the rent thus reserved to the assignor, his representatives or assigns. Lot No. 125 the lessee assigned to William Levely, and subsequently took from Levely a re-assign-ment thereof. He then assigned the term in that lot to John and James Sterrett, and also the rents reserved out of lot No. 124; and the assignees covenanted to pay the annual rent of £7 to such person as might be entitled to receive the same, and for every renewal of the term the further sum of £7. John Sterrett having died, James Sterrett, as survivor, assigned the term in lot No. 125 to John Steele. This assignment was made in 1792; and in the instrument full recitals are made and the title deduced from the original lease of Ann Fell of the 5th of July,

1769. In express terms, this assignment conveyed and transferred the unexpired term in lot No. 125, and clearly showed that it was but a leasehold estate that was the subject of the assignment. This assignment was, as had been all the preceding assignments of the term, duly recorded as required by law.

It would appear that John Steele died about the year 1809; and in 1841 a decree of the High Court of Chancery was passed for the sale of his real estate; and under that decree, the interest of the deceased in lot No. 125 was sold by a trustee. It appears to have been treated as part of the real estate of the deceased, though it was in reality but leasehold estate. It is under this sale that the present appellants claim, and the conveyances made by the trustee, for the two parcels in which lot No. 125 was sold, speak of and describe the interest or estate sold, as part of the real estate of John Steele, deceased. But, as we have determined in the case at law, before referred to, this mistake or misconception as to the nature of the estate sold, could not operate to make that freehold estate which was in reality only leasehold estate; and that the sale and conveyance by the trustee could only operate as an assignment of the leasehold interest of which John Steele died possessed.

Turning now from the line of transmission of the leasehold estate to that of the freehold or reversion, we find that in 1792, William Fell, having died seised of the reversion in lots Nos. 124 and 125, his reversionary interest in those lots, with other real estate of the deceased, was sold by a trustee under a decree of the High Court of Chancery; and the reversion in lot No. 125 was sold to Isaac Van Bibber, and a conveyance therefor was made to the purchaser by the trustee, on the 20th of February, 1793. The consideration for this reversionary interest in lot No. 125 is stated to have been eighty-one pounds, current money; and special reference is made in this deed

to the lease from Ann Fell to McMechen. It is expressly stated that the reversion was conveyed subject to the term, which was stated to be at an annual rent of £3. 10s. and also subject to all the covenants and conditions of the original lease, with the right to receive the rent apportioned to that lot. Thus plainly showing, that while the entire original rent reserved for the three lots had been apportioned, either by operation of law, or by the act and consent of the parties concerned, there was no intent or effective agreement on the part of the owner of the reversion, either that the lot should be released from the apportioned rent, or that it should be held by the assignee of the term, upon any other terms and conditions than those of the original lease.

In 1825, Isaac Van Bibber died; and thereupon the reversion in lot No. 125 devolved on his son, Washington Van Bibber, by devise; and upon the death of the latter in 1846, intestate, his real estate was partitioned, and the reversion in lot No. 125 was assigned to Nannie Van Bibber; and she, in 1851, conveyed this reversionary estate, together with all arrearages of rent incident thereto, to William Dawson. Sometime after the expiration of the term in 1868, Dawson died; and in 1877 George H. Williams, as trustee under the will of Dawson, and the widow of the testator, sold and conveyed lot No. 125 to the present defendant, Silljacks, together with all the arrearages of rent due from former tenants thereof. This is the title asserted by Silljacks in the case in 52 *Md.*, before referred to, and which was adjudged by this Court to be good and valid as against Presstman, notwithstanding Silljacks had been and was tenant of part of the premises, at the time of the expiration of the original term in 1868, holding by assignment, under a renewable lease or demise previously made by Presstman, as if he, Presstman, had been owner of the fee simple estate in that portion of the lot.

Now, in view of what has been decided by this Court in *Presstman vs. Silljacks,* before referred to, the sole general question, on this application, is, whether there is any sufficient equitable ground shown to justify a Court of equity to decree a specific performance of the covenant for renewal in the original lease of 1769? or whether that right has been lost by *laches,* and the adverse, hostile conduct and proceedings of Presstman, in denying and resisting the right and title of the party holding the estate in fee?

On the part of the present appellants, representing the right and estate of Presstman, it is contended, 1st, that the defendant, Silljacks, is not entitled to hold anything more than a dry legal reversionary title in lot No. 125, and that the appellants are entitled, under the special circumstances of this case, to a renewal of the former lease, *free of all rent* therein reserved, or, at most, a nominal rent only; or, 2ndly, if that be not their right, that they are, at any rate, entitled to the renewal, subject to the annual rent of £3. 10s. and the like sum for a fine for every renewal thereof in future, upon the payment of such arrearages of rent due, by virtue of the former demise, as the appellee may be entitled to receive.

Both of these propositions are controverted by the appellee, who denies that there is any equity whatever to entitle the appellants to a renewal of the lease.

1. With respect to the first proposition contended for by the appellants, we discover no, ground whatever upon which it can be maintained. It has been argued that it had been agreed and arranged that lot No. 124 should bear the rent of both lots No. 124 and 125, exclusively, after the surrender of lot No. 123, and thenceforth lot No. 125 should be entirely exonerated from all liability for rent. But for this we find no warrant in any of the transfers or assignments, of either the term or the reversion, in lot No. 125; and without such evidence, there

clearly would be no ground for such conclusion. It was surely not competent to the lessee or his assignees to charge the whole rent upon one lot to the entire release or exoneration of the other, without the assent of the owner of the reversion; and of any such agreement or assent there is no evidence whatever. It is true, nothing appears to have been said in the assignment by Sterrett to Steele, in regard to the rent at which the premises were to be held; but no express agreement or condition was necessary, as by the assignment of the term the assignee became bound; for the principle is well settled, that by accepting the assignment of the term, and entering into the possession of the land, the assignee subjects himself to all the covenants that run with the land, including that for the payment of rent. And, as we have seen, the sale and grant of the reversion to Van Bibber, under the decree of the Court of Chancery, by express terms, reserved to the grantee or assignee the rent apportioned to lot No. 125. Whether the rent thus reserved was in fact paid, or up to what time it was paid prior to the sale to Presstman, under the decree for the sale of the real estate of Steele, does not appear; but this is quite immaterial to the question under consideration. For unless the tenure created by the original lease has been changed, or the right to the rent released, the leasehold, during its continuance, remained subject to the rent reserved. In the case as presented, there is nothing to show that the tenure created by the lease of 1769 was changed by adverse claim and possession; for the original possession having commenced rightfully, under a lease for a certain and definite term, with right of renewal, nothing is to be presumed to make a continuance of the possession, *during the term*, by those holding in succession under the original lessee, wrongful or adverse. *Jackson vs. Davis*, 5 *Cow.*, 123. In such case, there must be proof of an open, notorious disclaimer of all holding under the landlord's

title, and an adverse claim set up that would amount to a disseisin, in order to rebut the presumption that the possession has been in accordance with the title under which it commenced; and proof that does not show this, is not evidence of adverse possession, that will affect the landlord, in a case like the present. *Gwynn vs. Jones*, 2 *G. & J.*, 184; *Campbell vs. Shipley*, 41 *Md.*, 81. . And the fact that it does not appear that rent has been paid on lot No. 125 for a great many years, affords no sufficient ground for the presumption that a change had been made in the tenure, or that the right to receive the rent had been released or extinguished, or that it had been charged upon lot No. 124, in exoneration of lot No. 125, as contended on the part of the appellants. A release or extinguishment of the right to demand or receive rent on a lease, such as that before us, could only be by deed; and the principle is well settled, that where the relation of landlord and tenant is once established, under a sealed lease, such as we have here, the mere fact that the landlord has failed to demand the rent, will not justify the presumption that he has released or extinguished his right to it under the lease. *Jackson vs. Davis*, 5 *Cow.*, 123, 131; *Saunders vs. Annesley*, 2 *Sch. & Lefr.*, 106; *Campbell vs. Shipley, supra.* There is, therefore, no ground for the contention of the appellants, that there should be a renewal of the term free of rent, or at a nominal rent only.

2. We come now to the second or alternative proposition contended for by the appellants; and in regard to this, there are several matters to be considered, which have been strongly pressed on the part of the appellee.

As has been shown, by the terms of the covenant recited, the renewal of the lease was stipulated to be made, upon the request and at the cost of the lessee or his assigns, and upon paying or tendering a certain fine, *at any time during the continuance of the existing term.*

Myers, *et al.*, Adm'rs of Presstman *vs.* Silljacks.

The time for renewal, according to the terms of the covenant, has long since past; and there was no fine tendered, or demand made for renewal, until nearly twelve years after the term had expired. And it is conceded, that Presstman, as assignee of the term, never paid or offered to pay any rent, but uniformly denied his liability to pay; and this too, notwithstanding that by the terms of the lease, default in the payment of the rent was cause for avoiding the lease, and all the covenants therein, at the option of the lessor or his assigns.

Now, there is no doubt but that a Court of equity will, in a proper case, and upon seasonable application, in the exercise of an established jurisdiction, decree specific performance of the covenant to renew a lease, though the term has expired, and the party has failed or neglected to apply for renewal, according to the terms of the covenant. In such case, time is not regarded as of the essence of the contract, and a Court of equity looks rather to the objects and intention of the parties, than to the strict letter of the contract. The leading objects and purposes of such a lease as that here involved are not difficult to discover, and a Court of equity should be liberal in applying its principles of specific performance, in order to secure the accomplishment of those objects. The main objects, doubtless, of the lessor in the making of such a lease, are the inducement, thereby offered to improvement, and the security and receipt of a clear annual rent, and the fine for renewal, based upon the full recognition of the reversionary estate in the lessor and those who may claim under him; while, on the part of the lessee, the object of the contract is the perpetual enjoyment of the land, with an encouragement to make such improvements as he would not be justified in making but with a view to, and the security for, such perpetual enjoyment.

But while such are the objects in view in the making of these leases, and such the liberal principles of a Court of

equity that will be applied for their accomplishment, there are well defined limits to those principles, which cannot be transgressed; and in their application the Court must ever be careful that it does not afford too great an immunity to those who may be disposed to be negligent, or by too great an indulgence to these applications, introduce confusion and uncertainty in respect to the titles of an important species of property.

We all know that estates dependent upon leases like the one before us, are exceedingly common in this State, and particularly so in the City of Baltimore. Both the reversionary freehold and the leasehold estates are the subjects of daily transfers and assignments, and they constitute a considerable portion of the substantial wealth of the people. While the one estate is subject exclusively to the law that governs real property, the other is mainly controlled by the law that governs personalty;—the one estate passing by descent, and being subject to the law of partition among heirs, while the other is the subject of administration, and is governed by the law that directs distribution of the personal estate. Both estates alike are the subjects of mortgage and judgment liens, and are constantly being sold and transferred in the enforcement of such charges. It is of the utmost importance, therefore, that the tenure be maintained with entire certainty; that the true relation of the parties to the property be at all times fully recognized, so that their exact rights may be known and enforced, and that third parties may know how to deal with respect to those rights. But if, as contended by the appellants, time is wholly immaterial, and that the equity of renewal subsists without regard to the lapse of time after the expiration of the term, the question occurs, how, in the absence of a distinct acknowledgment of the tenure, is the property to be treated and dealt with in the meantime, between the expiration of the term and the application to renew? There is an end,

of course, of the legal estate in the term, and the former relation between the parties may cease to exist at the option of the party in possession of the premises. He may think proper to repudiate and deny all obligations and relations as tenant, and set up a claim adverse to that of the landlord, as in this case. The owner of the freehold, in such case, has no remedy against the occupier of the premises except that furnished by action of ejectment; and we know the difficulties that exist in making that remedy always speedy and effectual, where it is necessary to trace descents and transfers of title over a period of a century. The remedies are by no means mutual; for while the former tenant may come for specific execution of the covenant for renewal, after the expiration of the term, the defendant has no means of enforcing that covenant against him. The parties, therefore, do not stand upon terms of equality in respect to the power of continuing the former relation of lessor and lessee, or of landlord and tenant; and these are considerations not to be lost sight of upon an application like the present. *Chesterman vs. Mann*, 9 *Hare*, 206, 212. But where the application for renewal is made within a reasonable time, and upon continued acknowledgment of the tenure created by the original lease, there, none of the uncertainties and embarrassments, which might and would likely exist in other condition of things, would or could intervene to make it improper for a Court of equity to grant relief.

In the case of *Banks vs. Haskie*, 45 *Md.*, 207, upon an application for specific performance of the covenant for renewal contained in a lease in all respects similar to the one in this case, this Court held, that the owner of the reversion or fee would be compelled to execute a new lease, provided the application be made within a reasonable time, after the expiration of the former lease, and all arrearage of rent and the renewal fine be first paid. But the Court was careful to declare that gross *laches* on

the part of the tenant in making his demand for renewal after the term had expired, and in seeking his remedy, would, as in other cases, be an insuperable bar to relief. In that case, there was no denial of the landlord's title, though there had been a failure to pay rent; and application was made for renewal within less than four years from the expiration of the term. The delay, and failure to pay the rent, the Court thought, upon the admissions in the answer of the defendant, were, to a considerable extent, attributable to the oversight and neglect of the defendant himself, or his agent, and not solely to the fault or neglect of the plaintiff. But the Court said that without the explanatory circumstances, there would have been a very strong case of *laches;* and which would of course, have precluded the plaintiff from all relief.

In that case, this Court stated and applied the principles of specific performance as settled in the Irish Courts of equity, prior to the Tenantry Act of 19 and 20 Geo. 3, ch. 30, in respect to this species of contract, rather than the more rigid doctrine that appeared to prevail in the English Chancery. In the Irish cases, decided without reference to the statute, the distinction is taken between the case of *mere neglect* to renew within the time designated in the lease, which will not exclude the party from the right of renewal, and the case of *wilful neglect or refusal* to renew, after which a Court of equity will not interpose. *Lennon vs. Napper,* 2 *Sch. & Lefr.,* 682, 686: *Jackson vs. Saunders,* 1 *Sch. & Lefr.,* 443, 455; and the case of *Boyle vs. Lysaght,* referred to in *Banks vs. Haskie.*

But, upon that distinction, and applying the liberal doctrine that prevailed in the Irish Courts, lapse of time is not without its effect upon the application to a Court of equity for specific performance. For while it is true that time is not generally regarded in equity as being of the essence of the contract, unless made so by express terms, or the nature of the subject-matter of the contract; yet

Courts of equity always have regard to time, so far as it respects the good faith and diligence of the parties. 2 *Sto. Eq., sec.* 776; *Maughlin vs. Perry*, 35 *Md.*, 359. The application for relief must be made within a reasonable time; but what will be a reasonable time must, to a considerable extent, depend upon the special circumstances of each particular case.

Here, as already stated, nearly twelve years had been allowed to elapse after the termination of the lease, before the application was made. No rent had been paid by Presstman prior to the expiration of the term, and none since; and, in the meantime, all right and title of the reversioner was, up to the time of filing the present bill, openly denied, and utterly set at defiance. Not only was the right of the reversioner or owner of the fee denied, and all relation with him disclaimed by the testator of the present appellants, but that right was contested in repeated litigations in which the testator was an active party.

As explanatory of all this, it is urged that Presstman was misled and deceived by the nature of the decree for the sale of Steele's estate, and the deeds from the trustee; that those proceedings led him to suppose that he was acquiring a fee simple estate in lot No. 125, and not merely a leasehold interest. But in answer to this it may justly be said, he was bound to know that he could acquire, under those proceedings, no other or greater estate than that owned by Steele at the time of his death; and moreover, that upon slight examination of the title upon record, he would have discovered that Steele's estate in the lot was but a mere leasehold. Of this the law charged him with knowledge. For as declared by Lord Chancellor SUGDEN, in *Butler vs. Portarlington*, 4 *Irish Eq. Rep.*, 1, in answer to the position that the tenant was ignorant of the title under which he held, that "nothing could be more dangerous to the administration of justice than to allow a

party, after many years enjoyment of an estate, to set up his ignorance of the title under which that estate was held. It is *crassa negligentia* in him if he did not know it; it was his duty to have made himself acquainted with it." Especially is this the case, where the title is all apparent of record, and nothing is necessary to a full disclosure but the simple precaution of an examination.

But whatever may have been the original mistake in fact, under which Presstman acquired his interest in the property, there were subsequent occurrences that brought to his knowledge the existence of the reversionary estate in the lot; and from that time, clearly, there could be no excuse for refusing to acknowledge the title of the superior landlord. It is shown, both by allegation and proof, that in 1868, soon after the expiration of the term, the then owner of the freehold brought an action of ejectment for the recovery of the lot; and still later, an action of trespass was brought by the present appellee, and in each of which actions the title to the lot was involved; and in both of which proceedings the appellants' testator appeared as defendant, and took defence, and asserted an adverse title to the lot in himself as against the owner of the reversion. Indeed, the present application is not even based upon a full recognition of the landlord's title; but it is admitted only in a limited and qualified way, notwithstanding the decision in the action at law.

Now, in such state of case, upon what principle of equity can the party ask for the specific execution of the covenant for renewal? After such long delay, such open repudiation of all obligations and relations as tenant, and such persistent assertion of adverse title to that of the rightful landlord, since the expiration of the lease, is there any equity of renewal that a Court of equity ought to enforce? We have not been able to find a respectable authority anywhere that would give the slighest sanction to the granting of relief in such case as the present.

Myers, *et al.*, Adm'rs of Presstman *vs.* Silljacks.

In the case of *Long vs. Long*, 11 *Irish Eq. Rep.*, (*N. S.*,) 252, upon an application for renewal, upon the liberal principles that prevail in the Irish Courts of equity upon this subject, after the landlord's title had been denied and controverted by the tenant, the whole question was fully considered, both in the Court below, and on appeal; and in that case the Court had no hesitation in refusing relief. The Lord Chancellor, in the course of his opinion, said: "It might be hard to persuade a Court that, after the tenant has disputed his landlord's title and put him to considerable expense in asserting it, he should still retain a right to the benefit of the relation he had disclaimed." And Lord Justice BLACKBURNE, in a concurring opinion, said: "In a suit of this kind, for the specific execution of a covenant for perpetual renewal, the right must be grounded on an admission of the title of the defendant. The claim of the tenant can only be based on the full power of the landlord to grant the estate sought for. It is, therefore, indispensably necessary for the tenant to admit the landlord's title in its entirety, and in the most unequivocal manner." And again, he said; "It would be, in my opinion, a plain violation of this principle to allow him to allege or plead as a justification in excuse for the delay, in its nature fatal to his case, a litigation in which he had unjustly and unsuccessfully contested the very title the admission of which is the indisputable condition of the relief he seeks."

Upon review of the whole case, we concur in opinion with the Court below, and think the equity for renewal entirely overcome by gross *laches*, and the hostile attitude of the complainant to the right and title of the owner of the reversion; and we must therefore affirm the decree.

*Decree affirmed.*

(Decided 4th May, 1882.)


ROBINSON, J., dissented.