ANDREW BANKS, and ANDREW BANKS, Trustee, *vs.*
THERESA HASKIE.

*Lease for Ninety-nine years, Renewable for ever—Equity will
relieve the Owner of the Leasehold interest who has failed to
obtain a Renewal within the Term, &c.—Effect of Gross
Laches on the part of the Owner of the Leasehold interest.*

Where the original term of a lease for ninety-nine years, renewable forever,
has expired, and the owner of the leasehold interest has failed to obtain a
renewal *within the term*, according to the literal wording of the covenant for
renewal, equity will relieve him, and compel the owner of the reversion to
execute a new lease, provided the application be made in a reasonable time,
and all arrearages of ground rent and the renewal fine be first paid.

But *gross laches* on the part of the owner of the leasehold interest in making
his demand for a new lease after the term has expired, and in seeking his
remedy, will, as in other cases, be an insuperable bar to relief in equity.

APPEAL from the Circuit Court of Baltimore City.

· The case is stated in the opinion of the Court. ·

The cause was argued before BOWIE, STEWART, MILLER
and ALVEY, J.

*Charles Poe* and *John P. Poe*, for the appellant.

If the complainant were ignorant in point of fact of the
time at which her term expired, her ignorance is both in
law and in equity, of such a character as to be considered
gross negligence, and she ought not to be heard to set it
up as the basis of a prayer for relief. Wherever such a
question has been brought before the Courts, they have
without exception determined, that ignorance is considered

wilful, when the party neglects the means of information that ordinary prudence would suggest; and it is clear that ignorance of a man's own rights conferred by an instrument actually in his possession or power, cannot excuse the performance of any condition imposed upon the persons claiming under the instrument. 1 *Platt on Leases*, 759; *Harris vs. Bryant*, 4 *Russ.*, 89; *Maxwell vs. Ward*, 11 *Price*, 3; *Same Case*, 13 *Price*, 674–6.

The original lease was duly executed, acknowledged and recorded, and was therefore notice not only to the appellee, but to the whole world, and to allow her to plead ignorance of its contents, would be to render useless the whole system of recording conveyances now in practice in this State, as well as to reverse the frequent and uniform decisions of this Court upon the subject. *Cooke vs. Kell*, 13 *Md.*, 469.

A further reason assigned for the interference of equity is, that "time is not of the essence of the contract to renew the term." This reason is also insufficient, for time is of the very essence of the contract (if there be any) in this case, and having been guilty of gross *laches* in delaying her demand for a new lease until many years after the expiration of the term, it is now too late for the appellee to ask a Court of equity to relieve her. *Maughlin vs. Perry*, 35 *Md.*, 352; *Kane vs. Hamilton*, 1 *Ridgeway's Cases in Parl.*, 180; *Bateman vs. Murray*, 1 *Ridgeway's Cases in Parl.*, 187; *Eaton vs. Lyon*, 3 *Vesey*, 690; *Baynham vs. Guy's Hospital*, 3 *Vesey*, 294; *City of London vs. Mitford*, 14 *Vesey*, 41; *Job vs. Bannister*, 2 *K. & J.*, 374; *Kerr on Injunctions*, sects. 84–98; *Adams' Equity*, s. p. 89; 1 *Platt on Leases*, 753, *et seq.*; 1 *Fonblanque's Equity*, s. p. 432.

This Court has but recently decided, (*Maughlin vs. Perry and Warren*, 35 *Md.*, 352,) that the demand for a renewal of a term must be made before the expiration of the term; and this was the opinion of Lord MANSFIELD,

Lord Thurlow and Lord Eldon, as well as the solemn adjudication of the English House of Lords, in the only two cases of this character which were brought before it for determination.

The case of *Boyle vs. Lysaght*, in the Irish House of Lords, was decided after the passage of what was known as the Irish Tenantry Act, and was simply a judicial interpretation of that statute. It was supposed that such an Act was necessary, because of the vast quantity of property which was held in Ireland, under leases containing clauses of renewal. It was strenuously argued that the fact that there were so many of these leases, was sufficient to give equity jurisdiction in cases of this kind; but the House of Lords of England, twice, after full argument, denied that they could found their decision upon a local equity, and refused to give relief. This local equity will be really the only ground upon which the appellee asks for an affirmance of the decree in this case. But no such circumstances exist in this State as those which were supposed to create what was termed a local equity in Ireland. Only a few of these leases have as yet fallen in, and we have here a complete system of recording, which gives full notice to the tenant of the time at which his term will expire, at the same time that it notifies him of the amount of the rent and the dates at which it accrues. It is the almost universal practice for each assignment to refer to the date and place of record of the original lease, and this practice does in point of fact afford notice to a prudent person of all the rights which he has acquired and all the liabilities to which he has become subject. As only a very few of these terms have expired, there can be no great hardship effected by deciding that there must be a renewal within the term, and such a decision will conduce to the settlement of all leasehold property upon a firmer basis than a contrary decision possibly could. If persons are authoritatively warned that they must comply strictly

14                         v. 45.

Banks *vs.* Haskie.

with the contracts to which they have willingly become parties, there can be no doubt that they will do so.

Every agreement, to merit the interposition of a Court of equity to enforce it, must be fair, just, reasonable, *bona fide*, certain in all its parts and mutual; and if any of these ingredients are wanting, equity will not decree specific performance. *Smith vs. Crandall*, 20 *Md.*, 482.

There is no pretence that the contract in this cause is not fair, just, reasonable, *bona fide* and certain in all its parts, but there is no *mutuality of obligation*. Even during the term, the appellant could not have compelled the appellee to renew. Suppose the property in controversy had so depreciated in value that the appellee became unwilling to pay the rent upon it, and had declined to ask for a renewal during the term, could a Court of equity compel her to take a new lease? Clearly not.

The failure of the appellee to demand a new lease has destroyed all the appellant's remedy for the collection of the rent, because, as there is no term there can be no reversion; and there being no reversion there can be no distraint, as a reversion is the foundation of the right to distrain. There can be no re-entry for rent in arrear under a lease, for the lease has expired. Therefore the only remedy that the appellant could resort to was by an action of ejectment, in which, under our law, he can recover the mesne profits as well as the property itself.

*John H. B. Latrobe*, for the appellee.

Time is not of the essence of a contract in equity. The mere fact that a day has been specified for its completion, will not *per se* render it essential; and if time is not originally declared essential, it cannot be made so by either party alone. Courts of equity will disregard generally the mere lapse of time; and upon the suggestion, or at the instance of him apparently at fault, will, regarding the spirit rather than the letter, decree a specific performance

of the contract; and this, upon the ground that the object and end of the parties was to attain the end proposed in the contract, and for which it was created, irrespective of the time named. *Roberts vs. Berry*, 3 *De G., M. & G.*, 284; *Peggs vs. Trisden*, 16 *Beav.*, 239; *Maughlin vs. Perry and Warren*, 35 *Md.*, 359; *Parker vs. Morold*, 16 *Jurist*, 959; *Barnard vs. Lee*, 97 *Mass.*, 95.

That the object and end of the lease, was to create a perpetual tenancy, by successive renewals of terms of ninety-nine years, is seen by the language in the concluding words of the covenant, "so that this present demise shall and may be renewable and renewed forever." That at the date of the lease in question, both parties regarded it as creating a perpetuity, cannot be denied—that it has failed to do this in legal technicality is the result of circumstances fully detailed in the bill—not one of which places the present case in the category of those where relief has been denied because of fraud or bad faith, or culpable negligence. On the contrary this case comes within the category stated by Story, when a Court of equity may decree a specific performance; that is to say—when there has been no *gross negligence* in the party seeking it,—when it is conscientious that the agreement shall be performed,—and when compensation can be made for the injury occasioned by non-compliance with its strict terms. *Story's Equity Juris.*, sec. 775; *Maughlin vs. Perry and Warren*, 35 *Md.*, 358; *Smoot vs. Andrews*, 19 *Md.*, 406.

Although many of the cases decided in the English Courts towards the close of the eighteenth century and in the beginning of the present, are adverse to the extension of the equity doctrine regarding time, to the renewal of leases, there were reasons for this doctrine, which cannot influence the Courts in this State. The first reason was, that such renewed leases tended to perpetuities, while our leases, held to be good at law, provide for perpetuities. *Moore vs. Foley*, 6 *Ves., Jr.*, 232; *Iggulden vs. May*, 9

*Ves., Jr.*, 326; *Eaton vs. Lyon*, 3 *Ves., Jr.*, 298; *Somerville vs. Chapman*, 1 *Bro. C. C.*, 62; *Tutton vs. Foote*, 2 *Bro. C. C.*, 636.

Again, the majority of leases there were not for a certain number of years only, but for a certain number of years dependent upon lives; and upon the naming of a life to succeed a preceding one that had fallen in, a fine for the naming of a successor could be demanded. During times of great mortality many lives might fall in, and in rapid succession—so that, if the lessee failed to name at the appointed time, the lessor would be deprived of fines, whose amount might be sufficient to make their collection important to the lessor ; hence, the time in such cases was regarded as an essential element of the contract.

Renewals have been decreed, notwithstanding a non-compliance as to time. *Rauston vs. Bentley*, 4 *Bro. C. C.*, 415; *Deane vs. Marquis of Waterford*, 1 *Scho. & Lef.*, 451, *foot note; Lord Ross vs. Worsop*, 4 *Bro. P. C.*, 44; *Anderson vs. Sweet*, 2 *Bro. P. C.*, 430; *Bridges vs. Hitchcock*, 1 *Bro. P. C.*, 522; *Boyle vs. Lysaght*, 1 *Vern. & Scriv.*, 135–166.

It is admitted that where there has been gross *laches* on the part of a complainant, the aid of a Court of equity will be sought in vain. But no such *laches* exists in the present case.

The placing the case on the ground of want of mutuality, is begging the whole question. The contract was, that on certain payments at a given time made by the lessee to the lessor, the latter would renew the lease. No one has ever doubted that such a contract was valid in its inception ; and yet there is no undertaking on the part of the lessee that he will either make the payment or demand the renewal ; so that if the want of mutuality now insisted on invalidated the contract, it was an invalid one from the beginning, which is not pretended.

MILLER, J., delivered the opinion of the Court.

The question presented by this appeal is confessedly one of much importance in this State, as it affects the rights of parties to leases for ninety-nine years, containing covenants for perpetual renewal. The present bill was filed by the owner of the leasehold interest, against the owner of the fee to enforce specific execution of a covenant of this character. No request or demand for a renewal was made by the tenant upon his landlord, during the original term of ninety-nine years, and the application to equity was not made until after its expiration. The question therefore is, has the leasehold interest under such circumstances ceased to exist, and all the improvements put upon the demised premises by the lessee, become the property and estate of the lessor, or can a Court of equity give the tenant relief by enforcing a renewal upon the equitable condition, that he shall pay all arrearages of rent and the stipulated renewal fine? To determine this we must first consider the terms of the lease, the covenant and agreements it contains, and in what relative position they stand, as well as the condition of the leased premises at the time it was executed, in order to ascertain the intention of the parties, and the purpose and effect of the instrument itself, for it is upon these latter that the solution of the question before us, in a great measure, depends.

The lease in the present case was executed on the 18th of January, 1772, and thereby, "in consideration of the rents and covenants hereinafter reserved, and contained on the part of the said" lessee, "his heirs, executors, administrators and assigns, to be paid, kept and performed," the lessors demise and grant unto the said lessee a piece of land, containing one-quarter of an acre particularly described, situated on Fells Point in Baltimore County, and Province of Maryland, and designated in a plan or plat of a town on said Point, by the number one hundred and forty-two, " to have and to hold the said demised pre-

mises with the appurtenances unto the said'' lessee, ''his heirs, executors, administrators and assigns from the day of the date hereof until the full end and term of ninety-nine years then next ensuing and fully to be completed and ended, under and subject nevertheless to the conditions, provisoes and limitations hereinafter mentioned, yielding and paying therefor yearly and every year during the said term, unto the said'' lessors, '' or to their or his representative or representatives, his executors, administrators or assigns, the rent of two pounds ten shillings, sterling money.'' Then follows a covenant by the lessee for himself, his heirs, executors, administrators and assigns, that he, his heirs, executors, administrators or assigns, ''shall and will, within two years from the commencement of the demise hereby made, *at his own proper costs and charges, build and erect on the demised premises a good and sufficient house to cover four hundred square feet,* covered with jointed cypress shingles, and the same keep in sufficient repair,'' and also a covenant in the same terms to pay the aforesaid rent yearly, and that it shall be lawful for the lessors, or their or his representatives, heirs, executors, administrators or assigns, to distrain in and upon any part of the demised premises for the rent aforesaid upon non-payment thereof. Immediately following these covenants, on the part of the lessee, is the covenant in question by the lessors for perpetual renewal of the lease, couched in the most formal terms. By it, the lessors, ''for themselves, their heirs, executors, administrators and assigns, do hereby covenant, promise, grant, and agree to and with the aforesaid'' lessee, ''his heirs, executors, administrators and assigns, that they, the said'' lessors, ''their heirs or assigns, shall and will, upon the request and at the costs and charges of the said'' lessee, ''his heirs, executors, administrators or assigns, and upon his paying or tendering the sum of two pounds ten shillings sterling, in the name of and as a fine for renewment,

*at any time during the continuance of this present demise,* make and execute to him, the said" lessee, "his heirs, executors, administrators or assigns, so requesting, paying or tendering as aforesaid, a lease or demise of the demised premises aforesaid, for ninety-nine years, to take effect and commence at the end of the term hereby demised, at and upon the same rent, and with and under the like covenants, provisoes and agreements, as are herein contained, *so that this present demise shall and may be renewable and renewed forever."* Then follows a covenant or agreement between the parties, that in case the house before mentioned shall not be so built within the two years, the lessee or his heirs, executors, administrators or assigns, upon paying or tendering the sum of two pounds ten shillings sterling to the lessors or their assigns, or lawful attorney, within one month next after the expiration of said two years, shall have two years, commencing from the expiration of the first mentioned two years, for erecting and completing said house, *but if* default shall be made in building said house within the first mentioned two years, and keeping it in repair, and also in the payment of the said sum of two pounds ten shillings within the term of one month next after the expiration thereof, *or* if after such last payment there shall be default in erecting and completing said house, and keeping it in repair, within the two last mentioned years, *or* if default shall be made in payment of any one year's rent for the space of six months after the same ought to have been paid as aforesaid, and there shall not be sufficient on the premises to secure the yearly rent by distraint, *then* it shall and may be lawful, upon such default, for the lessors or their representatives, heirs, executors, administrators or assigns, *to enter into the said demised premises, or into* any part thereof, in the name of the whole, and the same and every part thereof again to have, hold and repossess, as in their or his former estate, and as if this demise had

never been made, and upon such default, these presents, and every clause, matter and thing therein contained, as from and against the lessors, their heirs and assigns, shall immediately thereupon cease, determine and be void to all intents and purposes whatsoever.

The original term of ninety-nine years expired on the 18th of January, 1871. In 1848, Daniel B. Banks purchased the reversion in the demised premises for $80, subject to an outstanding life estate, which shortly thereafter fell in. In 1867, Henry Haskie, the husband of the appellee, purchased the leasehold interest in the same premises for the sum of $3400. He died in 1868, and in 1870 the appellee, his widow, became the assignee of his interest. In May, 1874, Banks brought ejectment against the appellee to recover the property, and on the 24th of October, 1874, the appellee filed her bill for a renewal of the lease and an injunction to restrain the ejectment. Banks died after he had answered the bill, and the devisee of his real estate was made defendant in his place. It thus appears the bill was filed a little more than three years and nine months after the expiration of the original term, and about five months after the action of ejectment. The case was submitted on bill and answer, and the Circuit Court passed a decree, directing the defendant, upon the complainant's paying the renewal fine of two pounds ten shillings sterling, with all arrearages of rent due under the lease, up to the time of such payment, and all necessary costs and charges, to execute to her a new lease for the premises for the term of ninety-nine years, to commence at the end of the original term, at the same yearly rent, and with the same agreements and covenants as are mentioned in the original lease, and granting an injunction, perpetually enjoining the further prosecution of the action of ejectment.

Before deciding how far the particular facts of this case disclosed by the bill and answer may operate to bar relief

on the ground of *laches*, we shall first consider, whether in any case of a lease of this character relief can be granted in equity, where the lessee has neglected to demand a renewal during the original term. This brings us to the inquiry, what was the intention of the parties, and what is the effect of such a conveyance? It seems to us quite clear, that the intention was on the part of the lessor to secure the prompt payment in perpetuity of the interest on a sum of money, equivalent to the value of the property in fee, at the time the lease was made, and on the part of the lessee to acquire a perpetual interest in the leased premises, which would justify his making permanent improvements thereon, and enable him to avail himself of the value of the property thus enhanced, as well as of its increase in value arising from other causes. The lease before us well illustrates and expresses this intention almost in words. The owner of vacant ground in a town located and about to be built up, from which he can derive in its then condition no adequate income, being himself unable or unwilling to erect the necessary buildings, instead of selling the property in fee for its then value and investing the proceeds in other securities, or raising by mortgage the money to make the improvements himself, resorts to this method of deriving an income from it, and making a secure and permanent investment of its value in the land itself. He makes a lease of it by which he secures the erection of improvements, which enhance the value of his property, and consequently make a permanent and safe investment of its actual market value, and this is all he had in view or intended to accomplish. The lessee is encouraged to spend his money in improvements by the permanency of the interest he acquires, and expectation of further increase in value, which will enable him also to realize a profit from the expenditure of his means. Thus a mutual advantage was contemplated by both parties at the time, and the result has usually been beneficial to both. Such

appears to us to be the intention and purpose of the parties in making and accepting a lease of this description, and the Courts should so treat and construe the instrument as most effectually to carry out that intent. This character of tenure is, so far as we know, among the States peculiar to Maryland. It has not been generally adopted so far as we are informed in any other State. It was introduced here in Colonial times, and has been a favorite system of tenure from a very early period. A large city has been built, and improved, and a vast majority of the real estate in Baltimore is now held under it. It is not open to any of the objections against perpetuities. Property is not thereby placed *extra commercium.* On the contrary, these leasehold interests devolve upon the personal representatives of the owner, are in terms made assignable, and they, as well as the ownerships in fee under the denomination of "ground rents," are subjects of daily transfer, and are constantly sought for as safe investments of capital. It is a peculiar description of tenure which has been sustained by our Courts, and approved and fostered by our people. While the ground rents from their nature are usually of a fixed value, the leasehold interests are more or less fluctuating. In many, and indeed in most cases, they have largely increased in value with the growth of the city. And most extensive and costly improvements have been and are daily made by owners of such interests on grounds thus leased. If then in any case a party who may have recently made such improvements or purchased such an interest at its full present value, should through forgetfulness or neglect fail to secure a renewal of the lease during the original term, is he without remedy, and must he surrender under an action of ejectment his entire property to the owner of the fee? It is easy to see on which side of such a case substantial justice lies, and unless there be some inflexible rule or principle, or some binding authority, or current of

decisions, which have definitely settled the law to the contrary, we are of opinion our Courts of equity ought to grant the relief asked for, and compel a renewal on the equitable conditions stated in the decree before us.

How then stand the authorities? We have found none in this country bearing on the subject. All we have been referred to coming from the Courts of our sister States, are cases in which there was a lease for a definite and comparatively short term, with an agreement or privilege to the lessee to renew for a single other like term. They are not cases like the present, and the decisions throw no light upon the questions here involved. Nor has this description of lease ever been generally used in England. From our examination of the cases, we find but one or two instances in which a covenant for perpetual renewal has been plainly expressed in an English lease, and in those the Courts refused the application for renewal under special circumstances. There are quite a number of cases in which the question has arisen, whether particular covenants in leases are to be construed as covenants for perpetual renewal or not, and in such cases the strong inclination has been not so to construe them, if, by possibility they can be construed otherwise. Most of the cases on this point are referred to and commented on in the opinion of the LORD CHANCELLOR in *Browne vs. Tighe,* 8 *Bligh N. S.* 272. The rule there stated as deduced from all the authorities is, "that a covenant to receive the construction of perpetual renewal must be plain and distinct, and such as to bear no other construction without force and violence done to the words and the context." That case is only important here as showing, that while there are perpetual leases in England, as in Manchester and other places, they are unlike the one before us, as not being made so by covenants, but by the original constitution of the lease itself creating an interest resembling the Scotch *feu* for a fixed rent, and as also showing that the interest so created though per-

petual is still leasehold and not freehold, and is in no wise obnoxious to the rule against perpetuities. In one of the earlier cases there referred to (*Iggulden vs. May*, 9 *Ves.*, 324,) Lord ELDON said that upon the question of specific performance of a covenant for perpetual renewal, "Lord THURLOW almost brought himself to a notion in which I cannot follow him, that any man who enters into such an agreement must be taken so little to understand the nature of a bargain and of property, that the Court ought not to execute such a bargain, but he never got so far in judgment." This notion of Lord THURLOW was also repudiated in other cases, and the doctrine of the English Courts now is that there is nothing irrational in such a covenant, and if found plainly expressed, and application be made within the time stated in the lease, a Court of equity will enforce it as it will any other contract. But as already stated, instances of its incorporation into an English lease are exceedingly rare. In Ireland however, leases similar to this and identical in effect, were in almost universal use, and the Courts of that country, presided over by very able judges, including Lord Chief Baron GILBERT, for a long series of years, and in numerous instances, did not hesitate to grant relief to the tenants upon condition of making just compensation to the landlords, where by mere neglect they had failed to demand renewals within the time specified in the leases. At length the landlords brought several of these cases by appeal to the House of Lords of Great Britain, and in two notable instances in 1784 and 1785 (*Kane vs. Hamilton* and *Bateman vs. Murray*, to be found in *Ridgeway's Cases in Parliament*, 180 *and* 187,) the appellate tribunal reversed the decrees of the Irish Court. The opinion in one case was delivered by Lord MANSFIELD, and in the other by Lord THURLOW, and the rule there laid down is that where the lessee by neglect has lost his legal right of renewal, he must, before he can be entitled to relief in equity, prove some fraud on the part of the lessor,

by which he was debarred the exercise of his rights, or some accident or misfortune on his own part which he could not prevent, by means whereof he was disabled from applying at the stated times for a renewal, according to the terms of his lease. If this rule with the reasoning on which it is based, is to be adopted as the law of such cases in this State, then undoubtedly the complainant and all other lessees in like or similar positions are without remedy. It appears however that soon after the decision in *Bateman vs. Murray,* it was seen its effects would be so disastrous upon the interests of Irish tenants, that Parliament interposed, and passed the Irish Tenantry Act, which provided in effect that in all cases of mere neglect, where no fraud appears to have been intended on the part of the tenant, Courts of equity should relieve upon adequate compensation being made to the landlord. After the passage of this Act, and after appellate jurisdiction had been restored to the Irish House of Lords in 1787, the case of *Boyle vs. Lysaght,* (*Vernon & Scriven,* 135,) came before that tribunal, in which Lord Chancellor LIFFORD delivered a most able and instructive judgment upon the history and effect of such tenures, and the practice and power of the Courts in such cases independent of the statute. That judgment in many of its features is so just and apposite to the case before us, and the condition of these tenures in our State, that we must quote from it, even though it further prolongs this opinion.

"In the course of the argument" says his Lordship, "a good deal has been said upon the subject in general, which I think is a matter of great and universal concern in this kingdom—I say universal concern, because a great part of the lands in this kingdom, has been for a long time held by leases depending upon lives with covenants for perpetual renewal. It may be proper therefore, not to speak merely on the case now before us, but also to explain the history of this tenure in this kingdom, and the determinations concerning it in our Courts. How

long it has prevailed I do not pretend to say; it might have been introduced in the North, but in the South it has prevailed since the time of the great Earl of *Ormond,* who, in order to people his vast estates in that part of the kingdom, and to invite a respectable and improving tenantry, introduced this tenure. It had the desired effect, and in the nature of things these leases have a tendency to create a respectable and improving tenantry. It obtained till it had acquired these tenants great respect and very valuable properties, inasmuch as they were considered to have a *perpetual interest.* These leases were then considered as perpetual interests, and upon that principle they gained ground and became a fund for settlements of every kind, for mortgages and other securities for money. If a man had one of these leases, there would have been no more doubt of lending him money than if he had the fee. For some time however, great difficulties did arise in Courts of equity concerning these leases. Tenants like other men, are subject to that misfortune attending on human nature of neglecting their own affairs. Hence it happened that tenants neglected to make renewals upon the fall of the lives, and were guilty of great *laches;* the landlords thereupon brought ejectments and the tenants resorted to Courts of equity for relief; and Courts of equity where the breach was made up by an adequate compensation, thought they were entitled to relief; but still considerable difficulties arose in estimating what should be a compensation, until that great man, Lord Chief Baron GILBERT, who presided in the Court of Exchequer, in this kingdom, devised the compensation of septennial fines. Accordingly in the case of *Anderson vs. Sweet,* 1717, he decreed a renewal to the tenant upon the payment of septennial fines and interest, and this decree was affirmed by the Lords in 1722, (*Vide Brown, P. C.,* 430.) Courts of equity were very glad to lay hold of this rule, and in every case that came before them afterwards, they held that the tenant was entitled to a renewal upon

those terms except in cases of fraud or dereliction. There is a long string of cases that came into public discussion in the Courts, some with and some without negative clauses; for in some of these leases was inserted an express proviso, that if the tenant neglected to renew within a certain time, he should not have a right to call upon the landlord for a renewal. But yet notwithstanding that clause, Courts of equity adopted the same rule as coming under the idea of compensation, and in that case which has made so much noise, of *Murray* and *Bateman*, which came before me in 1776, I had a great number of these cases laid before me besides those that had been cited at the bar. I also enquired of the Judges, and of the ablest men and oldest practitioners in the Hall, and they all agreed that the uniform practice was to decree renewals in all cases, except where there was fraud or dereliction on the part of the tenant. In consequence of this general remonstrance I formed my opinion, notwithstanding any ideas upon the subject that I might have brought with me from England, *where this kind of tenure is not known.* Accordingly I decreed a renewal. I did consider there was a *local equity,* and as I have often heard it called the *old equity of the kingdom.* We all know the fate of that decree; upon an appeal to the House of Lords in England, it was reversed. I am satisfied that the principles of it were not understood there. They were unacquainted with that *local equity* and that it was the *intent originally of the parties to convey a perpetuity;* all this I say was unknown to them; *they had no such tenures;* no such determinations in that kingdom. Some very respectable and eminent men who concurred in the reversal, with whom I have since held conversation, have told me that they had altered and changed their opinion. They said that according to English principles the reversal was right, but that taking into consideration *the usage in Ireland* and all the circumstances of the case, it was wrong. The voice of the people expressing a dissatisfaction with that determination of the

Lords, and a general alarm in consequence, brought the point before the Legislature and *the old equity* was revived by the Act. By the Act the old equity was revived indeed, though it had never been made; after the supreme jurisdiction had been restored to this House, I would have had no hesitation in determining as I had done before in *Murray* and *Bateman.*"

The decisions of the English House of Lords to which we have referred, made at the time they were, are not absolutely binding upon the Courts of this State, and sincere as is our admiration of the learning and ability of the great Judges who delivered the controlling opinions in those cases, we think it would be both unwise and unsafe to adopt them as the law to govern this class of cases in Maryland. The long use of this species of tenure by our people, the vast amount of property held under it, and involved in and to be affected by the general principle which our Courts may establish, as controlling the right of renewal of such leases, have, as it appears to us raised a local equity here equally strong in favor of the lessees, as the like facts and circumstances, more than a century ago, raised in Ireland—an equity which we cannot overlook or disregard, and which constrains us to follow, and adopt the more liberal principles and practice of the Irish Courts in such cases. In so doing we are in no wise making new agreements for the parties in these cases, but simply enforcing and carrying out, what we understand to have been the original intention of the parties to such instruments, and make them subserve the purposes which they were originally designed to accomplish. Nor by this determination are we enlarging or extending, the powers of Courts of equity, but merely bringing this class of contracts within the acknowledged law of equity jurisdiction, as stated by Judge STORY: "Where the terms of an agreement have been strictly complied with or are incapable of being strictly complied with; still if there has not been gross negligence in the party, and it is conscien-

tious that the agreement should be performed, and if compensation may be made for any injury occasioned by the non-compliance with the strict terms; in all such cases Courts of equity will interfere and decree a specific performance. For the doctrine of Courts of equity is not forfeiture but compensation, and nothing but such a decree will in such cases do entire justice between the parties." *Story's Eq.*, sec. 775.

But while establishing this general principle as applicable to this class of cases, we are of opinion that gross *laches* on the part of the lessee will here, as in other cases, be an insuperable bar to relief in equity. It remains then to consider whether there has been such *laches* in the present case. We have already stated when the term expired, as well as the date of the ejectment by the landlord and of the filing of this bill. It appears from the bill and answer, that no ground rent was paid on this property, from the time the leasehold interest was purchased by Henry Haskie. The bill avers that the said Haskie, the husband of the complainant and under whom she claims, was a German living in a small way, and not an educated man, or one versed in titles to property, or the examination thereof, nor is the complainant better informed than he was, and that the assignment to Haskie, by the party from whom he bought, did not contain any reference to the original demise or the chain of title connected therewith. This latter averment is not expressly denied by the answer, but in response to this allegation of ignorance, and that the complainant was not aware the ground rent was claimed by Banks, the answer avers that she did in fact know the amount of the rent to which the property was subject, the name of her lessor to whom the rent was payable, the time when the term would expire, and the mode by which it could be renewed. This responsive averment, as the case was submitted on bill and answer, must be taken as true, and if there were no other

admissions in the answer, or circumstances explanatory of the delay, it would present a very strong case of *laches*. But the answer admits that no bill for ground rent had been presented by respondent since the year 1866, *because the same being small it had escaped his attention*, it having been the custom of the previous tenant to call and pay the same of his own accord, and he is advised, it was the duty of the complainant to do the same thing; that for several years past the collection of his ground rents was left entirely to his son, *who in the discharge of his duty, only discovered this rent was in arrear after the expiration of the term*, and then having consulted counsel, he was advised he could bring ejectment to recover the property, which he accordingly did. From this the inference is plain, that the fact that this rent was in arrear escaped the notice of Banks and his son, whose duty it was to collect the same, until after the term had expired, and we cannot escape the conclusion, that the non-payment during this period was owing to this oversight. This explains also the delay on the part of the complainant, in not asserting her rights sooner after the expiration of the term. If demand of the ground rent had been made, and ejectment brought at an earlier period, she would undoubtedly have sought relief at an earlier date. Under these circumstances we do not think the delay is to be imputed altogether to her fault. She sought relief promptly enough after the ejectment, and, we cannot, in view of these admissions in the answer, declare that she has been guilty of such *laches* as will debar her of the relief she has sought. For these reasons we shall affirm the decree. We are of opinion, however, that the costs of this proceeding in the Circuit Court, as well as the costs of this appeal, must be paid by her.

*Decree affirmed, and*
*cause remanded.*