## THE A. S. ABELL COMPANY OF BALTIMORE CITY *vs.* THE FIREMEN'S INSURANCE COMPANY OF BALTIMORE.

*Marketable Title—Specific Performance—Laches in Failing to Renew Lease After Expiration.*

In 1771, the owner of a lot of ground leased the same for ninety-nine years with a covenant for renewal during the continuance of the demise. In 1802, the owner of the leasehold conveyed it in trust for the use of his wife for life, and after her death for the use of their children. Emeline, one of these children, died intestate in 1838, leaving a husband and three infant children. The life-tenant died in 1852, and a bill in equity was filed in that year for the sale of this and other property. The three children of the life-tenant and the children of Emeline were parties to the bill, but not the latter's husband who was then a non-resident of the State. He appeared as guardian *ad litem* of his children, but there was nothing to show that he knew that the suit concerned the property of his wife. In 1853, the said leasehold property was conveyed under a decree in the cause to the plaintiff's predecessor in title, and has ever since been in the possession of the plaintiff and those under whom it claims. The original lease expired in 1870, and was renewed in 1886 by the plaintiff. In 1897, the plaintiff redeemed the rent and acquired the fee. Defendant agreed to purchase the property and upon a bill for the specific performance of the contract objected that the plaintiff was unable to convey a good marketable title in fee and alleged that a fourth interest was outstanding in the heirs of the husband of Emeline. *Held*,

1st. That an undivided fourth interest in the equitable leasehold interest vested in Emeline and upon her death intestate in 1838, the same passed absolutely to her husband as the law then stood.

2nd. That the husband of Emeline was not bound by the proceedings for the sale of the property instituted in 1852, since he was not a party to the suit and neither knew nor had an opportunity to know that his rights were involved.

3rd. That upon the expiration of the original lease in 1870, the leasehold interest was extinguished, except in so far as a Court of equity would relieve the lessee from the forfeiture resulting from the non-renewal of the lease during its continuance.

4th. That the neglect of the heirs and distributees of the husband of Emeline to make any claim themselves to renew the lease, or to compensate those who had paid the rents, or to make any claim to the property, for more than thirty years against the persons having open and exclusive

possession, constitutes such laches as would bar them from obtaining any relief.

5th.  That the plaintiff's title to the property is consequently a marketable title, free from any reasonable doubt, and such as the defendant should be required to accept.

Appeal from a *pro forma* decree of the Circuit Court No. 2, of Baltimore City.

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, BOYD, PEARCE and JONES, JJ.

*Bernard Carter* and *Charles McH. Howard* (with whom were *Richard M. Venable* and *Edwin G. Baetjer* on the brief), for the appellant.

*George Whitelock* and *Edward I. Koontz*, for the appellee.

FOWLER J., delivered the opinion of the Court.

This is a special case stated, in the nature of a bill for specific performance, under the provisions of sec. 184, &c., Art. 16 of the Code.  Its object is to obtain the decision of this Court upon the question whether the title to the property sold by the plaintiff to the defendant is a good and marketable fee-simple title, free from liens and incumbrances.  It appears from the agreed statement of facts that the Firemen's Insurance Company of Baltimore, sold at public auction to the A. S. Abell Company, of Baltimore, the fee-simple lot of ground and improvements in that city, known as number 4 South street, for the sum of fifty thousand dollars, subject to the usual implied condition that the title should be as above described, that is to say, a good, marketable fee-simple title. By the *pro forma* decree of the Circuit Court No. 2, of Baltimore City, in which these proceedings were instituted, it was declared that "none of the matters and facts set forth in said case render the title of the plaintiff to said property unmarketable, or other than such a good title in fee-simple as the defendant should be required to accept."  It was further adjudged by this decree that the purchaser, the A. S. Abell

Co., should upon the execution and delivery by the vendor of a deed in the usual and proper form, consummate the sale by paying to the vendor the purchase money due upon the sale. From this decree the purchaser has appealed. It becomes necessary, therefore, in the first place, to ascertain what are the facts upon which the appellant bases its objections to the title, and secondly, to determine whether these facts and the law applicable thereto, justify the appellant in refusing to consummate the sale.

(1) What are the facts?

It appears from the agreed statement of the special case stated that in 1771 the then owner of the fee-simple title to the property in question executed a ninety-nine year lease, reserving an annual rent of six pounds, five shillings sterling, and containing the usual covenant for renewal "during the coutinuance of the demise so created." In 1802, William Cole, having become possessed of the leasehold interest thus created, conveyed it in trust to John Salmon in consideration of an intended marriage between himself and Isabella Salmon, the daughter of the grantee. The trust declared by this conveyance was upon such marriage for the sole and separate use of said Isabella for life and from and after her death "to the use and behoof of the children of said Isabella by the said William to be begotten, and their executors, administrators and assigns; if but one, then to the use and behoof of the said child and his or her executors," &c. In case of the death of Isabella without leaving a child or children there was a limitation over to the grantor. The marriage referred to in the deed of trust just mentioned took place, and Mr. and Mrs. Cole had four children. We are concerned with the share of only one of them in the property in question, Emeline, who married Charles Byrne and died intestate in 1838, while her mother was still living, leaving surviving her, her husband, Charles Byrne, and her three infant children. The equitable life-tenant, Mrs. Cole, died February 1st, 1852, and very soon thereafter, on April 27th of the same year, a bill was filed in the Superior Court of Baltimore City for the sale

of this and other property and the distribution of the proceeds. The three surviving children of Mr. and Mrs. Cole, and the three infant children of Emeline Byrne, were made parties to the cause just mentioned. Charles Byrne, however, the husband of Emeline, was not a party. By virtue of the decree of Sept. 18th, 1852, the property mentioned in the bill, including the property on South street, here in question, was sold. Robert Garrett & Sons became the purchasers of the South street property for nine thousand dollars, and the sale was finally ratified and confirmed on January 11th, 1853.

At the time of the institution of the proceedings in 1852, it was supposed that the South street property was fee-simple, but after the sale an agreement was filed between the parties to the cause and the purchasers, admitting that said property had by mistake been represented at the sale to be fee-simple property, whereas it was leasehold, and consenting "that an abatement equal to the capitalization at six per cent of said rent of six pounds, five shillings sterling should be made from the purchase-money; upon which the Court by order directed the auditor to allow said abatement in his account. And on the 30th May, 1853, the auditor filed in said cause his report and accounts wherein he divided the net proceeds of such sale into four equal parts, and sub-divided one of said parts into three equal portions, distributing one of said portions to each of said three children of Emeline Byrne, viz., one to Mary Byrne, one to Isabel Byrne, and one to Charles C. Byrne." This distribution account was finally ratified on June 11th, 1853. It also appears that in September and October, 1853, orders of Court were passed directing the trustee to draw checks for the amounts thus distributed to Emeline's infant children, one check having been drawn to order of one of such infants, another to the order of an attorney of one of them, and a third check to the order of an attorney for the guardian of the remaining infant, who was appointed in Florida. It does not appear whether, in point of fact, the infants received their respective distributive shares.

By deed dated July 5th, 1853, the leasehold interest in the property so purchased by Robert Garrett & Sons was conveyed to the President and Directors of the Associated Firemen's Insurance Company, the Messrs. Garrett, the original purchasers, uniting in said deed and reciting that since the sale to them they had assigned their interest, as purchasers, to said corporation. It is admitted that ever since the execution and delivery of said deed, the said insurance company and its assigns (the last thereof being the vendor, who is the Firemen's Ins. Co. of Balto., the plaintiff and appellee) "have been in the exclusive, uninterrupted, continuous, open and notorious possession of said lot of ground   *   *   *   *   under claim of right and under color of title created by said sale and deed and said proceeding whereunder said sale was made."

In conclusion we should mention the futher important facts that in 1870 the original lease expired, and on November 20th, 1886, a new lease was executed by the owner of the fee to the appellee's predecessor in title, who also on 25th June, 1897, purchased the fee and redeemed the outstanding rent.

(2) Having thus fully stated the facts we will be able briefly to dispose of the controlling questions of law presented by this record. We do not propose to consider them all, for we think it entirely unnecessary to do so.

It is conceded that the undivided fourth interest vested in Emeline Byrne was an equitable leasehold interest in the property which is the subject of this litigation, and it follows, therefore, that as the law of this State existed at her death in February, 1838, this vested one-fourth interest in remainder in the chattel real passed to her surviving husband, Charles Byrne, absolutely, for it was not until the Constitution of 1851 (Art. 3, sec. 38), and the Code of 1860 (Art. 45, sec. 2), passed in pursuance thereof, that the common law rule by which a surviving husband was entitled, without administration, to all the chattels real of his deceased wife, was altered.

Before proceeding further it may be well to recall the general principles which should guide us in deciding whether the title before us is one which the defendant purchaser should

be required to take.    Obviously he ought to have what he has purchased and is prepared to pay for.    But while it is settled that he cannot demand a title that is absolutely perfect, yet a Court of equity will see that he gets a title which is free from *reasonable doubt.*    In the case of *Gill* v. *Wells*, 59 Md. 492, it is said: "As to what doubts will be sufficient no general rule can be laid down."    Quoting from *Dobbs* v. *Norcross*, 24 N. J. Eq. Rep. 327, this language was adopted in *Gill* v. *Wells.* "*The doubt must be considerable and rational,* such as would and ought to induce a prudent man to pause and hesitate ; not based on captious, frivolous and *astute niceties,* but such as to produce real *bona fide* hesitation *in the mind of the Chancellor.*"    See also the very recent case *Chew* v. *Tome, extrs., &c., ante* p. 244.    Opinion by JONES, J., in which the general rule is expounded and enforced.

This doctrine being then firmly established, it only remains for us to ascertain whether the conceded facts and the inferences to be drawn therefrom render the title to the property here involved unmarketable or liable to the objections which have been so forcibly urged against it by the appellant.

It was most earnestly contended on the part of the appellee that Charles Byrne was bound by the proceedings of 1852, which were instituted in the Superior Court of Baltimore for the sale of the property and the distribution of the proceeds. But we are unable to adopt this view.    It is conceded that he was not a formal party to the suit, and if he is bound by the decree therein passed it must be because he was aware of the pendency of the suit, and knew or ought to have known that his rights were in some way involved and refused or neglected to appear and make his defense.    It is upon this general principle that *Albert* v. *Hamilton*, 76 Md. 311; *McKinzie* v. *B. & O. R. R. Co.*, 28 Md. 161; *Parr & Cockey* v. *State, use of Cockey*, 71 Md. 220, were decided.    In the case first cited it is said: " These complainants knew of the pendency of the former suit ; they ought to have been made parties to it, and they would have been made parties on their own petition. They, by their own neglect or wilful refusal, lost their right

to take part in the control of the proceedings, examine and cross-examine witnesses and appeal from the decree." It was held, therefore, that having placed themselves in this situation, having been witnesses in the cause with every opportunity to learn the subject-matter of the suit, they were bound by the decree. In *McKinzie* v. *Rail Road Co.*, it was held that a judgment in a replevin suit was binding on persons who are not parties, but who are directly interested in the subject-matter of the suit, and who knew of its pendency and had the right to and took part in its control, direction or defense. The same rule is applied in a number of other cases not necessary to cite. But in the case before us there is absolutely nothing to show that Charles Byrne knew or had an opportunity to know *what was the subject-matter of the suit* by which he is sought to be bound. While he was residing in Jacksonville, Florida, he was appointed guardian *ad litem* for Charles Bryne, one of his infant children, and filed the usual formal answer, " That such infant was ignorant of the matters and things alleged, &c., and prayed the protection of the Court." He subsequently filed a petition in the Florida Court to be appointed guardian of his son, Charles C., in which he stated that his son was " entitled to receive from the estate of William Cole, late of Baltimore, $900 or thereabouts, being the distributive share to which he is entitled from the proceeds of sale of certain property lately made." He died, however, before the money was paid. In all this we see nothing which would, according to the settled rule justify us in holding that Charles Byrne and his representatives should be bound by the decree of 1853, the same as if he had been a formal party to the suit. It is true he knew there was a suit, but the very petition he filed in the Florida Court would indicate, if it shows anything material, that he was led to believe the suit referred to estate of *William Cole*, in which *he* had no interest. And then, too, inasmuch as the proceeds were to go to his children, he was naturally led to believe that he had no interest in the cause. He knew or was bound to know, because the title of his wife was a matter of record, that her interest in the South street

property was leasehold and that, therefore, upon her death it was his absolute property. It was not to be expected that a suit would be filed in a Maryland Court while he was living in Florida for the sale of *his* undivided interest in the property without making him a party, and still less was the pendency of the suit, the subject-matter of which he believed and so declared related to the estate of Wm. Cole, likely to furnish him with proper notice that the cause related to *his property* when the proceeds were to be divided *among his children.*

But waiving any further discussion of the effect of the decree of 1853, on Charles Byrne and his representatives, and independent of all other questions in the case, we will proceed to consider the effect of the expiration of the *original lease* of 1771, its subsequent renewal in 1886, by the then owner of the fee, and the purchase of the fee and the redemption of the rent in 1897.

Upon the expiration of the original lease in 1870, the leasehold interest was gone, unless a Court of equity, under the doctrine first announced in this State in the case of *Banks* v. *Haskie,* 45 Md. 207, would relieve the lessees from the legal forfeiture resulting from the language of the lease. The right of renewal is by the very terms of the lease confined to the period during the continuance of the demise. But, as we have seen, the lease expired in 1870, and there was no renewal until sixteen years thereafter, when in 1886 the lease was renewed not to Charles Byrne and his co-tenants, but to the Directors of the Firemen's Insurance Company. And now over thirty years after the end of the term in which Charles Byrne had any interest, and a half century after the predecessors in title of the plaintiff went into possession under a judicial sale it is claimed that Charles Byrne or his personal representatives or next of kin should be allowed by a Court of equity to intervene for the purpose of enforcing their claims.

It must be remembered that the term created by the original lease, the term in which Charles Byrne was interested, had expired. It had expired in 1870. The time for which it was created was at an end. While it is true that at law the lease-

hold interest of Charles Byrne was absolutely destroyed by the failure to renew during *the continuance of the lease*, and under certain circumstances a Court of equity would afford him relief, yet that relief would not include a restoration or revival or continuance of *the original* term.   All that equity could do under any circumstances would be to require the lessor to give a *new lease and a new term* with a like covenant for renewal and subject to the same rent.   45 Md. 207.   And the question we are to decide is, not whether those claiming under Charles Byrne are barred by the Statute of Limitations, but whether, under all the circumstances of this case, they will be heard at this time to set up claims, which it may be conceded were originally such as would receive the favor of a Court of equity. The original claimant Charles Byrne died nearly fifty years ago.   One of his three children, survives.   His two daughters and their husbands are dead.   Four grandchildren, all adults, also survive.   But in all this time no claim has ever been made.   The original claimant, we are told, upon the death of his wife in 1838 removed to Florida, where he continued to reside until his death in 1853, never having returned to this State after the death of the life-tenant, Mrs. Cole, in February, 1852.   Although, as contended by counsel for the appellant, Mr. Byrne became, upon the death of his wife in 1838, the absolute owner of the undivided fourth here in question, he never, even after the death of the life-tenant, made any claim to the rents and profits thereof.   So far as is disclosed by the record he appears to have abandoned Maryland as a place of residence and during the remainder of his life resided in Florida without making known his claims—although he knew or was bound to know what were his rights in this respect.

And his children have been equally guilty of *laches*.   After the death of their father, they grew up, married and with the exception of one of them, have died.   None of them has ever, as yet, made the claim which astute and able counsel discovered and have so forcibly contended may yet be made.   They have never applied for administration on their father's estate. They have never offered to put themselves in a position, which

would commend them to the favorable consideration of a Court of equity.   On the contrary they have never recognized their liability to pay rent under the original covenant, nor have they offered to compensate those who have paid it.

While it appears that the father and grandfather of those who, it is suggested, could now attack the title to the property in question was absent from this State and resided in Florida until his death, it does not appear that his children and grandchildren also resided or do now reside there.   But this fact we think is immaterial, so far as the question of *laches* is concerned, for we are not willing to hold that one may remove from this State, owning a leasehold interest, and under the circumstances of this case, thirty years after the expiration of his leasehold estate, have the option of either of compelling a renewal and paying *all* rents in arrear, if the value of the leasehold should justify such a course or if it should be more to his advantage abandon his interest and thus escape the burden of paying rent, taxes &c., for the many years he allowed the property to remain in the hands of others.

But as we have seen, not only the original term in which Charles Byrne was interested, ended in 1870, but the new term then created was also destroyed in 1897 when the appellee's predecessor in title purchased the fee and redeemed the outstanding rent created by the new lease of 1886.

The appellee and those under whom it claims having been since 1853 in exclusive, continuous, open and uninterrupted possession under claims of title to the leasehold property, they should not be disturbed, especially when, as we have seen, those who could have made a claim, have been guilty of laches in making a *bona fide* effort to enforce it.

It follows from what we have said that inasmuch as the title offered to the appellant is, in our opinion, free from reasonable doubt, and is, therefore, a good, marketable fee-simple title, the *pro forma* decree appealed from should be affirmed.

*Decree affirmed with costs.*

(Decided June 13th, 1901.)