# CIRCUIT COURT NO. 2 OF BALTIMORE CITY.

Filed September 8, 1922.

BERTHA L. WEHR, PLAINTIFF,
VS.

THE ROLAND PARK COMPANY OF BALTIMORE CITY, A BODY CORPORATE, AND THE ROLAND PARK ROADS AND MAINTENANCE CORPORATION, A BODY CORPORATE.

*Isaac Lobe Straus* for plaintiff.

*W. Calvin Chesnut, W. Thomas Kemp* and *D. List Warner* for defendants.

FRANK, J.—

The amended and supplemental bill of complaint in this case was filed by four lot owners in what is known as Roland Park. The relief prayed is that the covenants in the deeds hereinafter referred to be declared ineffective and no longer binding against the complainants or their respective properties and that an injunction issue restraining the collection of the maintenance tax provided for by said covenants. The defendants are The Roland Park Company and The Roland Park Roads and Maintenance Corporation, who have duly answered.

This case was well tried on both sides and the Court is indebted to counsel for the industry and ability with which they prepared and conducted the case.

The testimony is quite voluminous and, although there may be conflicts as to minor matters, the essential facts are undisputed.

The development known as Roland Park, now in Baltimore City, is widely known as a model of suburban development. The original corporation, The Roland Park Company of Baltimore City, was incorporated in 1891 and acquired the property which it thereupon proceeded to develop. In 1892, Plat No. 1, involving 116 acres of land, was recorded, and the land was laid out in 427 lots. In 1901, Plat No. 2, affecting about 52 acres, was recorded, the land being divided into some 85 lots. In 1903, Plat No. 3, comprising 120 acres and subdivided into 192 lots, was recorded. The present controversy involves more particularly these three plats, although the future of the remaining parts of Roland Park and of Guilford is, to some extent, involved in the outcome of this case. For this reason it may be proper to state that Plat No. 6, comprising 52 acres and subdivided into 132 lots, was filed in 1909; Plat No. 5, containing 67 acres, laid out in 201 lots, was recorded in 1911; Plat No. 4a, containing 11 acres and 32 lots, was filed in 1915, and the Plat of Guilford, containing 335 acres and 761 lots, was filed in 1913.

The land embraced in all of these plats is contiguous, has a combined area of some 752 acres and together constitutes the admirable real estate development above referred to.

Not a little of the success of this project is conceded to be due to the plan of its development, some of the essential features of which were the restrictions upon the nature and character of the improvements permitted and the reservation, collection and expenditure of the maintenance tax which is the subject-matter now before the Court. These features were part of a general plan, conceived and put into effect for the benefit of the property owners. The maintenance tax was reserved and provided for in the deeds to all purchasers of lots and two forms of the covenant creating it appear, that contained in deeds of lots in Plat No. 1, and that contained in deeds of lots in Plats Nos. 2 and 3. They appear in the deeds to the complainants, which are in evidence in this

case, three of which are to lots in Plat No. 1, and one in Plat No. 3.

The maintenance tax was payable to and disbursed by The Roland Park Company of Baltimore City until 1909, at which time The Roland Park Roads and Maintenance Corporation (hereinafter called the Maintenance Corporation), was formed, and by deed and agreement executed and recorded in that year, The Roland Park Company conveyed to the Maintenance Corporation all its rights in the beds of highways in the various plats, the sewerage system and the right to collect and distribute the several maintenance funds, and designated the Maintenance Corporation as the body corporate to receive, collect and disburse the same. Thereafter, the maintenance tax was made payable to and disbursable by the Maintenance Corporation.

Upon the acquisition of Guilford in 1912, The Roland Park Company, one of the defendants herein, succeeded the old Roland Park Company of Baltimore City.

The Maintenance Corporation is, in effect, controlled and governed by the residents of Roland Park, inasmuch as a majority of its twelve directors have always been and are now nominated by the Roland Park Civic League, to membership in which all adult residents of Roland Park are eligible upon payment of merely nominal dues. The total amount of the capital stock of the Maintenance Corporation is $100, divided into 20 shares of $5.00 each, a majority of which are owned by the Civic League which must hold the same in trust for the promotion of the welfare of the residents and property owners of Roland Park.

The covenant in the deed of complainant, McCormick, to his lots in Plat No. 1, reads as follows:

"8. And the said party of the second part (grantee) does agree for himself, his heirs and assigns, that after January 1st, 1898, the land hereby conveyed, shall be liable annually for a proportionate amount of the cost of *lighting and keeping the said streets in repair* and *of maintaining the sewerage system of the land* included in said Plat No. 1 of Roland Park, which said proportionate amount shall be sixty-two and one-half (62½) twenty-two thousandths of the total annual

costs thereof, provided, however, that the amount to be so paid shall not exceed twenty-five cents per front foot per annum; said proportionate amount to be paid annually by said party of the second part, his heirs or assigns, to the said Roland Park Company of Baltimore City, its successors or assigns, or to such persons or body corporate as it or they may direct."

The covenant in the deed to complainant, Bertha L. Wehr, for her lots in Plat No. 3 read as follows:

"8. That the land hereby conveyed shall be liable annually for a proportionate amount of the cost of *lighting and keeping in repair the roads,* lanes and paths (including sidewalks) shown on said Plat Number Three of Roland Park and said Addition thereto, of collecting and disposing of the garbage, ashes and rubbish on the land included in said plats, and of maintaining the sewerage system of the land included in said plats, which said proportionate amount was by the aforesaid deed from the party of the first part to the said Maintenance Corporation fixed at one hundred and eleven (111) thirty-three thousandths of the total annual cost thereof; said sum being payable quarterly by the said party of the second part, her heirs and assigns, to the said Maintenance Corporation, its successors and assigns; provided that the amount to be so paid shall not exceed, in any one year, twenty cents per hundred square feet of the superficial area of the land hereby conveyed. Provided, however, that if in any year the said Maintenance Corporation, its successors or assigns, shall deem it necessary or advisable to expend an amount for the purposes aforesaid, which shall require the collection from the lot owners in said Plat Number Three and said Addition thereto, of more than twenty cents per hundred square feet for the payment thereof, and in any of the two preceding years less than twenty cents per hundred square feet shall have been collected and expended under this clause, the said Maintenance Corporation, its successors and assigns, may collect under this clause an amount per hundred square feet for said year which shall not exceed said amount of twenty cents per hundred square feet added to the aggregate of the difference between twenty cents

per hundred square feet and the amounts actually collected under this clause in said preceding two years.

"9. It is distinctly covenanted and agreed between the parties hereto, that all the covenants and agreements above expressed shall be held to run with and bind the land hereby conveyed, and all subsequent owners and occupants thereof, until the first of January in the year nineteen hundred and thirty, and the acceptance of this deed shall have the same effect and binding force upon the party of the second part, her heirs and assigns, as if the same were signed and sealed by the party of the second part; provided, however, that the covenants contained in the aforegoing paragraph numbered eight (8) shall be perpetual in their operation; and provided further that any of the covenants contained in this deed, except the covenants numbered eight (8), may be at any time, and in any manner changed, with the mutual written consent of the said maintenance corporation, its successors and assigns, and the owner or owners for the time being, of the land hereby conveyed."

The covenants to all other deeds in Plat No. 1 correspond with that above recited from the deed to the complainant McCormick, with the exception that the proportionate amount of cost to be paid varied with the number of front feet in the particular lot involved. The covenant in all other deeds to lots in Plats Nos. 2 and 3, correspond with that above recited from the deed to the complainant, Bertha L. Wehr, except that the proportionate amount of cost to be paid varied with the area of the particular lots involved. The tax or charge for lots in Plat No. 1, therefore, varied with the front footage of the lots, with a maximum charge of twenty-five cents per front foot. The tax for lots in Plats Nos. 2 and 3 varied with the superficial area of the lots, the maximum charge being twenty cents per one hundred square feet of such area.

The aggregate amount of front footage in Plat No. 1 is 22,000 feet and so the maximum possible tax for this plat is $5,000. The aggregate number of square feet in Plat No. 2 is 18,000 square feet, and the maximum possible tax for this plat is $3,600. The aggregate number of square feet in Plat No.

3 is 33,000, and the maximum possible tax for this plat is $6,600.

It will thus appear that the amount of annual maintenance tax in the case of each lot is quite small in comparison with the value of the lot and the improvements thereon. The maximum annual tax in the case of each complainant is as follows:

Wehr .......$22.28
McCormick .. 15.63
Freeman .... 18.75
and
Willms....... 58.75 for two lots.

While in the early days of each plat a certain portion of the maintenance tax had been devoted to the lighting of the streets, Baltimore County, prior to the annexation, and since annexation, Baltimore City has borne the entire cost of this lighting and no part of the maintenance fund for a number of years has been applied to this purpose.

On October 1st, 1921, Baltimore City took over the operation of the sewerage system of Roland Park and, although prior to that date this system had been maintained out of the maintenance tax, since that date no portion of the maintenance tax has been expended upon the sewerage system.

On June 8th, 1922, the Maintenance Corporation conveyed to Baltimore City the streets, roads, avenues and park lane in Plats Nos. 1, 2, 3 and 6, but not any of the lanes or paths, nor certain portions of Upland road, Wilmslow avenue, Falls road and Edgevale road and also conveyed the sewers, both storm and water drain, the sanitary sewers and the sewerage disposal field. By deed it was expressly stipulated that Baltimore City acquired no right to collect the maintenance tax, and that the city assumed no obligations as to the paths and lanes, nor duties of repair or upkeep and attention to the sidewalks and sidewalk lawns. It further provided that it should not be construed "to impair or affect the duty" of the Maintenance Corporation "to repair and maintain and care for the said sidewalks and sidewalk lawns, and trees and shrubbery planted therein or related thereto, to the same extent and effect as fully, and to all intents and purposes as is now the duty of the Maintenance Corporation.

The parties hereto agreed at the hearing that no change of legal relationship resulted from the annexation of the land affected by Baltimore City; that Baltimore County's rights and duties were essentially the same as those now enjoyed and owned by Baltimore City, although the city has already assumed the performance of greater duties and may thereafter be expected to assume the performance of still other duties not heretofore actually fulfilled by the county.

As shown by the evidence, the maintenance fund is now being expended for the following purposes: repairing roads, lanes, gutters, drains, sidewalks and sidewalk lawns; cleaning roads, lanes, gutters and drains; caring for trees, shrubbery, sidewalks and sidewalk lawns; cleaning off snow from walks and roads, cleaning the dump, purchasing and keeping in repair tools and equipment, for watchmen and salaries and other administrative expenses.

First—Plaintiffs contend that the covenants to pay the maintenance tax were invalid in their inception for several reasons:

1. That, as by their terms, these covenants are perpetual, they violate the "Rule Against Perpetuities" and are therefore void. Covenants in leases for ninety-nine years, renewable forever, not unlike the covenants in question, are held not to violate the rule. Banks vs. Haskie, 45 Md. 207, 218: Hollander vs. The Central Metal Company, 109 Md. 131, 156, etc.

2. That the covenants, so far as they relate to the Roland Park Company, are ultra vires. The Roland Park Company was incorporated in 1891, and the powers conferred upon it were set forth in the general terms then prescribed by the statute. Its corporate purposes were stated to be "buying, selling, mortgaging, leasing, improving, disposing of or otherwise dealing in lands in the State of Maryland" and so forth. The covenants require the company to apply the tax paid to it to certain specified purposes for the benefit of the land sold and in conection with the land remaining unsold. It would seem that this obligation is properly an incident to the disposing of the land and as such within the corporate powers of the company. No question was or can be

raised as to the scope of the very full powers conferred upon the Maintenance Corporation.

Second—The plaintiffs further contend that by the true construction of the covenants they do not call for the services actually rendered by the Maintenance Corporation, and, therefore, plaintiffs are released from the obligation of further payment thereunder.

The authorities cited by plaintiffs fully sustain the proposition that covenants imposing charges and burdens on land must be strictly construed. These authorities, however, involve cases in which the benefits derived were exclusively in favor of the dominant estate, the estate burdened enjoying substantially no benefits. In this case, on the contrary, direct services were rendered to and direct benefits enjoyed by the servient estates. For this reason, I am of the opinion that the rule of strict construction should not be applied but, rather, the ordinary rule that the intention of the parties is to be sought and given effect.

From the very inception of the project in 1891, certain of the services provided for in the covenants were rendered or paid for by Baltimore county. Thus, the burden of the repair and lighting of the roads was early borne by the county, and this continued until the annexation of the property by Baltimore City on January 1st, 1919, since which time the maintenance of the sewerage system has also been assumed by the city. Neither county nor city has ever had anything to do with the sidewalks or lanes (alleys), and, as above stated, in the deed to the city of the roads and so forth, the paths and lanes are expressly excluded from the grant, and the city expressly disclaims any liability therefor, or for the maintenance of the sidewalks and sidewalk lawns. Their repair and maintenance has always been taken care of, first, by the old Roland Park Company and, since 1909, by the Maintenance Corporation. "Keeping in repair the streets," as provided for in the deeds for the lots in all three plats, in my opinion, clearly includes keeping in repair sidewalks, lanes and sidewalk lawns. (Provost vs. Water Company, 162 Pa. State 279; McKinsey vs. McKee, 109 Ind. 206; Pomfrey vs. Saratoga Springs, 104 N. Y. 467, 468).

Moreover, during the whole period, gutters and drains were repaired; roads, lanes and gutters and drains cleaned; trees and shrubbery, sidewalks and sidewalk lawns cared for; and snow was cleaned off all walks and roads.

It is contended by plaintiffs that all of these services were required to be performed by the county, and, in any event, must be performed by the city in the exercise of its municipal duties and authority; that it is illegal for any other agency than the municipality to perform these functions and, therefore, the covenants were invalid in their inception. This contention, it seems to me, is unsound. If true to the extent contended for by the plaintiffs, it would be illegal for a man to cut his sidewalk lawns in front of his house, or to remove the snow or the rubbish from the road or sidewalk in front of his lot. That he can legally do each of these things, seems to me to be beyond question, and, if that is the case, he can certainly contract with someone else to do this work for him, and that is what is done by the covenants in question. The true view, it seems to me, is that expressed by the witness Bouton, that the covenants were intended to raise funds with which to supplement the work done by the municipality to the extent that a particular service is not rendered at all or is only partially or inadequately rendered. At no time was the maximum maintenance tax adequate to perform all of the services provided for in the covenants. It was clearly intended and necessary that a discretion should be exercised as to the particular services and the extent of each to be performed at any particular time. The correct meaning of the covenant is that the tax is to be applied, as far as possible, to the performance of these services. It is clear, therefore, that the covenants were not intended to be indivisible as contended for by the plaintiffs and that their argument that they become unenforceable when any particular service therein provided for ceases to be rendered must also fall.

The expression "keep the streets in repair," used in the deeds in plat No. 1, is not a technical one, but must be understood in connection with the circumstances of the particular case. The services hereinabove enumerated have been rendered since 1891, and, until the present litigation was contemplated had never given rise to any question. They had been continuously performed, with universal approval, for years before the plaintiff, Mrs. Wehr, acquired her property in 1911, and the plaintiff, Freeman, his property in 1919; the plaintiff, McCormick, his property in 1896, and the plaintiff, Willms, his property in 1911. There was not only, therefore, the contemporaneous construction to which weight is given where words of uncertain meaning are used, but, more than this, a construction already well established and followed over a period of years, with reference to which each of the plaintiffs may be presumed to have contracted and by which they should be held to be bound. This view is strengthened by the fact that each of the plaintiffs with the exception of Freeman, with full knowledge of its application, paid the maintenance tax for a number of years, and Freeman, likewise, paid it for over two years before the institution of this suit.

I find that the following services are properly within the covenants and are still being rendered and paid for out of the maintenance tax: repairing roads and lanes, gutters and drains, sidewalks and sidewalk lawns, cleaning dump and so forth. These and the incidental expenses of administration have been paid for out of the fund substantial sums in each year have been paid for them.

As to two of the items involved, I entertain some doubt. Each winter the Maintenance Corporation removes the snow from the walks and roads. This is work that neither Baltimore County or Baltimore City has ever done. The ordinances of Baltimore City require that snow be removed from sidewalks by the abutting property owner at his own expense. The maintenance tax is a means by which the individual property owner in Roland Park may perform this duty. The municipality's obligation to remove snow from the driveways is performed only in congested parts of the city, and never in suburban districts like Roland Park. The removal of snow by the maintenance corporation in Roland Park results, not merely in the removal of the snow from the side-

walk and roadway in front of any particular lot, but insures access to and egress from such lot in front of the lots of all other lot owners, a service which obviously can be properly rendered only by a joint enterprise.

In my opinion a covenant to pay a tax to the Maintenance Corporation for the doing of this work is entirely legal. The question at issue is as to whether it is included in the "keeping of the streets in repair" as provided in all the covenants, and "in the disposing of rubbish" as provided in the covenants relating to plats Nos. 2 and 3. I think that "keeping in repair," in view of the history of these covenants and the circumstances of this case, should be given the broad meaning of doing what is reasonably proper to keep the sidewalks and roads in condition for the uses for which they were intended. The removal of snow is obviously work of this character. I am of the opinion, moreover, that in the case of plats 2 and 3, the removal of snow is embraced in "disposing of rubbish."

I have, however, reached a contrary conclusion as to the employment of "watchmen". I am unable to determine that such an employment can, in any real sense, be considered as related to the keeping of streets in repair. The suggestion is made by defendants that watchmen at night perform the same duty of inspection of streets as does the superintendent of the Maintenance Corporation, during the day. Assuming such duty of the watchmen to exist, it is, at the most, only a subordinate and incidental duty, and not the primary or important purpose for which the watchmen are employed. I am, therefore, of the opinion that the further expenditure of any part of the maintenance tax for the employment of watchmen should not be permitted.

Third—That plaintiffs contend finally that the covenants have never been at any time performed by the defendants, and that they are therefore relieved from further liability for the tax. That in any event they are not now being performed and they are therefore now so relieved. It is believed that the above recital of the work done under the covenants is a sufficient answer to this conclusion, and it will not be further discussed.

The time may come when the municipality will render all of the services provided for in the covenants and then further payment of the maintenance tax will be improper. That time has never heretofore existed and has not now arrived.

For the reasons thus given, I am of the opinion that the relief prayed in the bill of complaint should not be granted excepting as to the employment of watchmen. If satisfactory provision for the discontinuance of such employment be made, I shall sign a decree dismissing the bill; otherwise, I am prepared to sign a decree enjoining said employment for the future. As the evidence is undisputed that the entire maintenance tax would still be needed for the performance of the services herein found to be within the covenants, no further relief seems to be required in my view of the case.