WHITING-MIDDLETON CONSTRUCTION COM-
PANY, A CORPORATION,

*vs.*

EDWARD D. PRESTON.

*Reversionary interests: owner of ground rents; injuries to
property; claim for damages.   Evidence: condition
of place after act complained of.
Experts: evidence of——.*

The landlord's interest in the land, out of which an irre-
deemable ground rent issues, is but a money investment analo-
gous to that secured by a mortgage.                    p. 216

For the owner of the reversion in a lot of land, leased for
99 years, renewable forever, under an irredeemable ground rent,
to be able to recover damages for an injury to a building there-
on, he must show that his reversionary interest was damaged in
consequence of the injury or partial destruction of the house.

p. 216

Where it is a question of the condition at the time of the
accident, evidence of the condition of the place after consider-
able time has elapsed, is not, in general, admissible, unless ac-
companied by evidence that such conditions had not changed
since the accident.                                 p. 220

Suit was brought for damages to a building claimed to have
been occasioned by the digging of a sewer near it without the pre-
caution having been taken to prevent the sinking of the land, etc.
To prove what precautions had been taken, a considerable time
after the accident the cobblestone pavement was taken up and
boards which had been driven in the ground for the purpose of
shoring it up, and left in the ground after the sewer was con-

structed, were drawn out so as to show the depth and character of the soil. *Held*, that, under such circumstances, as the depth to which the boards had been driven had not been changed since the accident, the evidence was admissible.            p. 219

In an action for damages because of the careless digging of a trench near the wall of the plaintiff's house, by reason of which the wall and house were injured, a person who, although not there the day the trench was dug, was there the day following when the trench had not been filled up, and while he could still see in the trench and see what had been done, and who had been an inspector of buildings, was *held* to be qualified to testify as an expert.                              p. 218

Such a witness should not be allowed to testify that the work had been negligently done, without first having told the jury how it had been done.                              p. 218

*Decided June 24th, 1913.*

Appeal from the Superior Court of Baltimore City (DOB-LER, J.).

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Jesse N. Bowen* and *Wm. Fell Johnson, Jr.,* (with whom was *John E. Semmes, Jr.,* on the brief), for the appellant.

*Edward N. Rich,* for the appellee.

PATTISON, J., delivered the opinion of the Court.

This action was brought by the appellee, Edward D. Preston, described in the declaration as the owner of the rever-

sion in fee and the annual ground rent of ninety-three dollars issuing out of a certain lot of ground known as 1704 Barclay street, located between Lanvale street and Lafayette avenue, in the City of Baltimore, under a lease for ninety-nine years, renewable from time to time forever, to recover for damages to his "said reversion and annual ground rent" resulting from injury to the dwelling house thereon, caused by excavations made by the appellant company in a private alley along and immediately adjacent to said dwelling, in the construction of a sewer in said alley for the Mayor and City Council of Baltimore.

The *narr.* alleges that by reason of the said injury to the dwelling house, it became unfit and unsafe for use as a dwelling and was, by the order of the Building Inspector of said city, torn down and destroyed.

In the trial of the case thirteen exceptions were taken to the rulings on the evidence. At the conclusion of the testimony the plaintiff offered one prayer, which was granted. The defendant offered six prayers; the fourth and fifth were granted, while the first, second, third and sixth were refused. To the granting of the plaintiff's prayer and the overruling of the defendant's exceptions thereto, and to the refusal of the defendant's first, second, third and sixth prayers the defendant excepted, which constitutes the fourteenth exception.

The case was tried by jury and a verdict was rendered by them for the sum of $1,690.90, upon which verdict a judgment was entered. It is from that judgment that this appeal is taken.

By the plaintiff's prayer the jury were instructed that if they found "that the excavations so made were carelessly and negligently made by the defendants, and that by reason of the careless and negligent manner in which said execavations were made, the aforesaid ground and improvements were damaged, and that by reason of such damage, if any, so done to the said ground and improvements, the plaintiff as the

owner of the aforesaid irredeemable ground rent sustained loss and damage, then the plaintiff is entitled to recover the amount, if any, of the loss and damage so sustained by him as the owner of the aforesaid ground rent." To the granting of this prayer the defendant specially excepted, the reason given therefor being that there was no evidence to support it.

By the defendant's first prayer, which was refused, the Court was asked to instruct the jury that there was no evidence in the case legally sufficient to entitle the plaintiff to recover, and by its second prayer, which was likewise refused, the Court was asked to instruct the jury that "as it appears from the undisputed evidence that the plaintiff was the owner of the reversionary interest and the annual rent of ninety-three dollars issuing out of the lot in question, and that there is no evidence to show any injury or damage to the lot itself." We will consider the aforesaid two prayers of the defendant in connection with the special exception to the plaintiff's prayer.

The plaintiff testified that he was the owner of the irredeemable ground rent of ninety-three dollars a year issuing out of a lot of ground mentioned in the declaration, and that the said lot, binding on the north side of an alley eight feet and four inches wide, in which the excavation was made, has a width of fifteen feet and five inches and a depth of ninety feet. The sewer was laid in the center of the alley, by the defendant, for the City of Baltimore, in March, 1911. He was not present when the excavations were made, but saw the trench upon the second day after a part of it had been partially filled. The trench ran parallel with the south side of the house and at a distance of two feet and nine inches therefrom. He was at the time Inspector of Buildings in the City of Baltimore, and received a message from the defendant company that the house was giving way and falling; that he could not, upon the receipt of the message, go at once to the scene of trouble, but sent an inspector, Mr. Schultz. Later in the day he went himself and found the "house was

not quite completely down—there were some temporary props there which Mr. Stockhausen was putting up but the house had settled over, being a party wall between this house and the next door house, it settled over so as to pull the second and third floor joists out of the wall and had gone over towards this alley and settled down so as to get the fronts broken and the steps all out of gear." The props ran from the extreme south side of the alley over against the wall of the house to keep it from falling. "The house was taken down, the side walls taken down to the first floor and part down to the second floor, almost all taken down, by order of the City." It was a three-story house, covering the entire width of the lot, with pressed brick front, brown stone steps and sills, and in fair condition before the excavations were made. He did not know the number of rooms in the house. It was idle at the time of the injury complained of and had been idle for some time. In his testimony he also spoke of the character of the excavations and the want of precaution taken by the defendant company to prevent injury to the building, but nothing was said by him, more than what we have stated, in relation to the damages sustained, resulting, as he alleges, from such excavations, and this, so far as the record discloses, is all that was said in relation to the injury or damage resulting from the defendant's acts.

As we have said, this action was brought by the plaintiff to recover for damage to his reversionary interest in consequence of the injury to, or partial destruction of the building or improvements upon the lot mentioned, resulting from the aforesaid excavations. Assuming, although we are not to be understood as so deciding, that the injury to the building resulted from the negligent and careless manner in which the excavations were made in the construction of the sewer in the alley, what evidence is there that such injury to the building resulted in damage to his reversionary interest in the property? It is not only necessary that it should be shown that the injury to the building was the result of the

negligent and careless manner in which the excavations were made in the construction of the sewer by the defendant, but to entitle him to recover it must also be shown that the plaintiff's reversionary interest was damaged in consequence of the injury to, or partial destruction of said dwelling house.

It is not disclosed by the record whether or not the holder of the leasehold interest, the substantial owner of the property (*Baltimore City* v. *Latrobe,* 101 Md. 632), has brought any suit or action to recover damages that might have been sustained by him in the partial destruction of said dwelling house. It may be that such action has been brought and that he has recovered damages therefor, or if not, it may be that he will yet bring an action to recover the same.

The plaintiff here is the owner of the reversion in the lot of land mentioned, leased for ninety-nine years, renewable forever, with the irredeemable ground rent incident thereto.

As was said in *Banks* v. *Haskie,* 45 Md. 218, "This character of tenure is, so far as we know, among the States, peculiar to Maryland. It has not been generally adopted, so far as we are informed, in any other State. * * * It is a peculiar description of tenure which has been sustained by our Courts, and approved and fostered by our people. While the ground rents from their nature are usually of a fixed value, the leasehold interests are more or less fluctuating." And JUDGE MILLER, in discussing the nature of the lease in that case, which was similar to the one in this case, said: "It seems to us quite clear that the intention was on the part of the lessor to secure the prompt payment in perpetuity of the interest on a sum of money equivalent to the value of the property in fee at the time the lease was made; and on the part of the lessee to acquire a perpetual interest in the leased premises which would justify his making permanent improvements thereon, and enable him to avail himself of the value of the property thus enhanced, as well as of its increase in value arising from other causes. * * * Instead of selling the property in fee for its then value, and investing

the proceeds in other securities, (the owner) resorts to this method of deriving an income from it, and making a secure and permanent investment of its value in the land itself."

And this Court in the case of *Baltimore* v. *Canton Co.,* 63 Md. 236, after quoting from *Banks* v. *Haskie* as we have done, said: "The landlord is not affected by the rise or fall in value of the fee; any enhancement in its value remains fixed in amount, and the lessor is really interested in the subsequent value of the land and the erection of improvements thereon, only *as furnishing a sufficient pledge or security for the sum certain to be annually* paid to him. * * * The landlord's interest in the land is but a money investment analagous to that secured by mortgage."

Neither the land in this case nor its value is shown to have been lessened by the acts complained of. The injury is to the building alone, and the plaintiff is not injured thereby, unless it be shown that by reason of such injury to the building his pledge or security for the annual payment of his rent is impaired to the extent of lessening the value of his reversionary interest in said property. As the record discloses, there was no evidence before the jury upon which they could have found that such pledge or security was impaired to the extent of lessening the value of his reversionary interest, or if so, no sufficient evidence to enable them to arrive at the amount to which he was entitled as damages therefor.

Moreover, if it be found that there was an impairment of the pledge or security for the payment of the rent at the time of the injury complained of, to the extent of lessening the value of his reversionary interest, it may have been but a temporary impairment, for when the building is replaced or rebuilt by the holder of the leasehold interest, the pledge or security of the plaintiff is fully restored. There is no evidence that the impairment of the pledge or security, if any, was likely to continue and become permanent in its character. In fact, so far as the record discloses, the building may have been restored even at the time of the trial of the case below.

It may also be said that if the building be not restored, the holder of the leasehold interest, an assignee of the lease, by reason of his privity of estate, is liable for the payment of the rent so reserved, and to him the plaintiff could at least temporarily look for the payment of such rent. *Hintze* v. *Thomas,* 7 Md. 346; *Baltimore* v. *Latrobe,* 101 Md. 632, and other cases. It is true that although liable, such lessee may be financially irresponsible and from whom the rent could not be recovered, but this is not shown by the record.

The verdict of the jury was for $1,690.90. How this verdict was reached it is difficult to understand, unless the actual injury or damage to the building was estimated by them to be the amount of their verdict. There is, however, no evidence in the record upon which they could arrive at this amount as being the sum required to restore the building to its former condition. If the amount of the verdict was arrived at in the manner stated, it did not represent the amount of damages to which the plaintiff was entitled. It was not the damage to the building to which the plaintiff was entitled, but it was the damage to his reversionary interest, if any, occasioned or resulting from the injury or damage to the building, and we are unable to find any evidence in the record tending to show that the reversionary interest of the plaintiff was damaged, or if so, any evidence upon which the jury could estimate such damage.

The prayer of the plaintiff should have been refused, and the first and second prayers of the defendant should have been granted.

The first, second, third and fourth exceptions are to the admission of answers to questions propounded to Edward D. Preston, the plaintiff.

In the first of these he was asked, "From what you saw, what precautions, if any, had been taken by the defendant to prevent, or taken by anyone to prevent the house being damaged by this excavation?" To which he replied, "None". The witness was undoubtedly qualified to speak as an expert

in relation to the matters to which this question was directed, but was he sufficiently familiar with the facts to enable him to answer the question? He had testified that he was there, though not on the day the trench was dug, but only upon the succeeding day when the trench was but partially filled, and when he could see in the trench and see what had been done, and also could and did see what had been done towards supporting the building as a prevention to injury resulting from the excavation. This, we think, would enable him to answer the question.

In the second exception he was asked: "Did you see any lagging there?" To which he replied, "There was some lagging, but the lagging was improperly put in." The question was a proper one, but the witness should not have been permitted to say "the lagging was improperly put in" without having first informed the jury how it was put in; this they were entitled to know.

The third exeception will be hereafter considered with the fifth, sixth, seventh, eighth, ninth, tenth, eleventh, twelfth and thirteenth exceptions.

In the fourth exception the witness was asked: "Is there any usual ordinary method commonly adopted to prevent the falling of houses by the giving way of ground underneath the foundation when the trenches are dug in the immediate vicinity of them?" To which he answered, "There is usually in addition to the lagging of trenches, propping or needling done." The witness here was testifying as an expert, and as the precautions required to be taken vary with the conditions existing, the question should have been so framed as to have made it applicable to the facts of this case, as disclosed by the testimony. The question we think is too general in that respect.

The testimony admitted under the third, fifth, sixth, seventh, eighth, ninth, tenth, eleventh, twelfth and thirteenth exceptions is based upon the knowledge acquired by the witnesses from an examination of the premises and alley in

which the sewer had been placed, made by such witnesses on the day of the trial, more than one year after the excavations had been made. The objection to the admission of this testimony is upon the ground that it is not affirmatively shown that the conditions had not changed since the acts complained of and the injury resulting therefrom.

The evidence was that in excavating in the alley, lagging, consisting of pieces of lumber two inches thick and eight inches wide, were driven in the earth and formed the sides of the excavation. That after the sewer was constructed and the trench filled, the top ends of the lagging were cut off below the surface of the ground and the balance of it was permitted to remain in the ground, and the alley paved where the trench had been dug. Upon the day of the trial, nineteen months after the excavation and construction of the sewer, the witnesses, whose testimony was objected to, went upon the premises, removed the cobble-stones, examined the soil and pulled up two pieces of the lagging, with a view of ascertaining the character of the soil and the depth to which the lagging had been driven. One of these pieces measured four feet and six inches and the other about five feet. They also testified that these two pieces were one-half inch apart.

This evidence was offered to show not only that the lagging did not go to the bottom of the trench, which the plaintiff's witnesses said was eight or nine feet deep, but also to show that the lagging was not placed side by side with no intervening space between it. This testimony was objected to by the defendant because of the lapse of time intervening between the excavation and the date of the examination, without any evidence showing that the conditions as to this lagging had in the meantime remained the same.

As a general rule, such evidence is not admissible where considerable time has elapsed, unless accompanied by evidence that the condition has not changed. 29 *Cyc.* 614; *Annapolis Gas Co.* v. *Fredericks,* 112 Md. 455. But to this rule there are certain well recognized qualifications and excep-

tions. *Annapolis Gas Co.* v. *Fredericks, supra.* And whether this rule is to be followed depends largely upon the character, nature and condition of the place or thing of which evidence of its condition is sought to be given, for where it may be reasonably presumed that during a given interval after an accident there has been no material change in the condition of the place or thing, evidence of its condition after that interval is admissible to show its condition at the time of the accident, especially where at the latter date its condition is such as to negative any correct inference of recent changes. *Ency. of Evidence,* vol. 8, page 905.

In this case we are to consider the probability, and susceptibility of change in the condition of the place or thing sought to be given in evidence. The lagging here mentioned when once driven in the earth, and over which cobble-stones were thereafter placed, in all probability remained in its position in respect to the depth to which it extended, at least it never came nearer to the surface of the ground, nor was there any change in the character of the soil. Therefore, in our opinion, the evidence was admissible at least to show the nature of the soil at the place of examination and the depth to which the lagging that was removed, extended. The lagging may have been forced apart, considering the fact that when examined it was only one-half inch apart, either in laying the cobble-stones or in the use of the alley thereafter.

We are passing upon the weight of this testimony only so far as it is necessary to determine whether it has a tendency to show the facts attempted to be proven. The other lagging was not examined, either in respect to the distance to which it was driven or as to the space, if any, between it, and the examination of the soil at this time, as disclosed by the testimony, was made immediately following a heavy rain. Nevertheless, we think the testimony should have been admitted, the force and weight of which was to be left to the jury.

The defendant's third prayer asked the Court to instruct the jury that there was no evidence in the case legally sufficient to put the burden of propping, shoring and needling the building alleged to have been damaged, upon the defendant. This prayer we think was properly refused. Propping, shoring and needling a building are some of the methods used or precautions taken when excavations are made near to a building as in this case, to prevent injury to the building. It may, or it may not, have been necessary in this case to have adopted these particular methods or precautions in protecting the building from injury, if some other method was used, such as lagging, for instance, but with nothing said in the prayer as to the employment of other methods or precautions, we think it might be misleading to the jury to be told that such precautionary methods were not necessary in this case.

We think the defendant's sixth prayer was properly refused.

There was a demurrer to the declaration, but it was overruled and the general issue was pleaded, and no notice of the demurrer was taken in the argument, and we shall therefore not advert to it, but treat it as waived.

The judgment of the Court below will be reversed.

> *Judgment reversed, new trial awarded, with costs to the appellant.*