## KING *v.* MAYOR AND COUNCIL OF ROCKVILLE

[No. 315, September Term, 1967.]

244

*Decided March 7, 1968.*

The cause was argued before HAMMOND, C. J., and MAR-
BURY, BARNES, McWILLIAMS and FINAN, JJ.

*J. Hodge Smith* and *R. Edwin Brown,* with whom were
*Ginsberg & Ginsberg* and *Hyman Ginsberg* on the brief, for
appellant.

*Roger W. Titus, Assistant City Attorney,* for appellee.

HAMMOND, C. J., delivered the opinion of the Court.

The Mayor and Council of Rockville (Rockville), acting un-
der Code (1966 Repl. Vol.), Art. 23A, § 2 (24) and Art. XII
A of its Charter, added by Ch. 826 of the Laws of 1961, un-
dertook an urban renewal project to rehabilitate a blighted area
of the City of Rockville and in the process condemned the com-
bination commercial and apartment property of the appellant,
Mrs. King. Mrs. King took a dim view of being required to
substitute cash for real estate and, displaying the courage and
fighting spirit Sir Winston Churchill said the English people
would display in repelling a German invasion of Britain by
fighting on the beaches and in the streets, attempted at every
stage to hinder and delay the condemnation proceeding, hoping
in the process to thwart it entirely. Eventually a jury awarded
her less than she conceives her property to be worth and she
now seeks relief from this Court.

Mrs. King makes three contentions. She says the trial court
erred (a) in refusing a continuance of the trial; (b) in not rul-
ing that the condemnation proceeding was invalid because of
failure to make provision for the relocation of tenants to ade-
quate quarters as Ch. 826 of the Laws of 1961 requires; and
(c) in refusing to permit testimony as to the value of her in-
terest, as an abutting landowner, in the bed of the street in
front of her property.

The petition for condemnation was filed on February 3, 1966.
The case came on for trial on May 25 following but Mrs. King
refused to allow the jury to view the apartments on the second
floor of her building and a mistrial was declared. The court
then ordered that a jury view of the apartments be allowed. Mrs.

King noted an appeal to this Court. We granted Rockville's motion to dismiss on July 25, 1966. On July 29 Rockville moved that the case be set for trial. Mrs. King filed a "cross-claim" and the case came off the trial calendar. Rockville filed a motion to dismiss the "cross-claim," which was granted. On August 29 Rockville moved to set the case for trial and it was set for October 18. On the basis of an unsworn letter from her doctor, stating that she had suffered periodic serious heart attacks during the past year and would not be able to appear for at least two weeks, Mrs. King moved for and was granted a continuance. The case was rescheduled for trial on November 9. Mrs. King again sought a continuance, attaching to her motion an unsworn letter from her doctor which stated she was presently "totally incapacitated" and that she would be "totally disabled for an indefinite period of time." Trial was reset for January 25, 1967. On January 19 Mrs. King again ran true to form. Her doctor's unsworn handwritten letter recited to the court that the day before she had had "an acute episode of atrial fibrillation and aggravation of her Heart Failure" and that she could not appear in court "until further convalescence." Judge Shook denied this third motion for continuance in a written order, which said: "It appears to the Court that the elderly defendant may never be well enough to attend Court." At the threshold of the trial Judge Pugh followed Judge Shook's order and denied an oral motion for a continuance.

We find no error and no prejudice in requiring Mrs. King to go to trial. Under Maryland Rule 527 and the decisions of this Court the granting or refusing of a continuance is in the sound discretion of the trial court and an important factor in the exercise of that discretion is whether the witness who is unavailable will be able to be present within a reasonable time. *Thanos v. Mitchell,* 220 Md. 389, 392-93. Passing the fact that Mrs. King did not present the affidavits specified by Rule 527 (c), we think it clear that Judge Shook's determination that Mrs. King might well never be able to appear in court or, at least it may be inferred, might never choose to appear was fully justified by consideration of the history of the case set out above. If there were error in compelling trial, there was no prejudice since Mrs. King's expert witnesses based their

testimony on all the facts and data that Mrs. King had given them as to rents, expenses, and vacancies, and were permitted to give estimates of value reflecting her theories that they might not have been permitted to give had she been present.

Assuming the proposition that Mrs. King, not having been authorized by her tenants to do so, had standing to raise the point that Rockville could not condemn her property by reason of its failure to have provided new quarters for each of her tenants, we think the point is without substance or merit. Chapter 826 of the Laws of 1961 provides in Section 5, the part here immediately pertinent, that after a plan for urban renewal of a slum or blighted area has been presented to and approved by Rockville and a public hearing has been thereon advertised and held, the project may proceed if Rockville finds (1) that the area involved is a slum or blighted area; (2) "a feasible method exists for the location of any families who will be displaced from the urban renewal area in decent, safe and sanitary dwelling accommodations within their means and without undue hardship to such families"; (3) the urban renewal plan conforms to the city's master plan; and (4) the plan will afford a maximum opportunity for the rehabilitation of the renewal area by private enterprise.

Early in the trial Rockville offered in evidence a duly certified copy of a resolution duly adopted by its Mayor and Council which showed determinations by it gratifying the four requirements of Ch. 826 spelled out above. In regard to the relocation of persons to be displaced by the carrying out of the project the resolution said:

> "WHEREAS there has been prepared and submitted a program for the relocation of families that may be displaced as a result of carrying out the Project in accordance with said Urban Renewal Plan; and
>
> "WHEREAS there have also been presented to the Governing Body [the Mayor and Council of Rockville] information and data respecting the relocation program which has been prepared as a result of studies, surveys, and inspections in the Project area and the assembling and analysis of the data and informa-

tion obtained from such studies, surveys, and inspections; and

"WHEREAS the members of the Governing Body have general knowledge of the conditions prevailing in the Project area and of the availability of proper housing in the Locality for the relocation of families that may be displaced from the Project area and, in the light of such knowledge of local housing condition, have carefully considered and reviewed such proposals for relocation; and

"WHEREAS it is necessary that the Governing Body take appropriate official action respecting the relocation program and said Urban Renewal Plan for the Project, in conformity with the contract for financial assistance between the Local Public Agency and the United States of America, acting by and through the Housing and Home Finance Administrator; * * *,"

and then resolved:

"That it is hereby found and determined that the program for the proper relocation of the families displaced in carrying out the Project in decent, safe, and sanitary dwellings in conformity with acceptable standards is feasible and can be reasonably and timely effected, without undue hardship to such families, to permit the proper prosecution and completion of the Project; and that such dwellings or dwelling units available or to be made available to such displaced families are at least equal in number to the number of displaced families, are not generally less desirable in regard to public utilities and public and commercial facilities than the dwellings of the displaced families in the Project area, are available at rents or prices within the financial means of the displaced families, and are reasonably accessible to their places of employment."

Mrs. King not only did not rebut or overcome the validity of this legislative finding, she strengthened it by cross-exami-

nation. Her lawyer attempted to have Peter Cheney, the Director of Urban Renewal for Rockville, say what specific program of relocation had been worked out for each individual tenant in Mrs. King's building. Judge Pugh would not allow answers to questions on this narrow point and we think he was right. The requirement that Rockville provide a proper and adequate relocation program does not mean that as a prerequisite to condemnation of a necessary property it lead by the hand to a suitable new home each tenant of that property or detail each step of the journey.

When counsel for Mrs. King pursued his inquiry of Mr. Cheney, he was told from the stand that Rockville had a "staff of relocation people who can meet with the people who are to be relocated and assist them in finding safe, decent and sanitary housing," that a study is made "of the dwelling units in the city and * * * of the number of units in various rental ranges," and a finding made "that the turnover and the number of units is adequate to meet, over a period of time, the relocation needs of the people in the project," as well as that the relocation plan "provides for relocation payments to assist them [the displaced families] in their moving expenses" and also provides for "inspecting all of the dwelling units that people move to from the project area * * * to be sure that the units are safe and sanitary and decent and * * * meet the codes of the county." With regard to specific plans for tenants of the subject property, Mr. Cheney stated that he planned "to meet with them, update our information on them and find their needs and see how we can assist them in finding a place to go," and that he already had information as to their "income; employment; size of family; [and] desire of where they wish to live." He went on to say that "as soon as we acquire that building [the appellant's property] we plan to meet with all of the tenants, both business and family and work with them on an individual basis to assist them in relocation as we have done with all of the other people who have moved out of the project area."

Mrs. King offered in evidence a letter from Mr. Cheney to a business tenant of Mrs. King, advising him that he was entitled to relocation moving expenses, that named officials of the relocation staff would be in touch with him to discuss mov-

ing plans and assistance in moving and that he would be given ample time to move. It is clear to us that Rockville met its burden of showing it had adopted the required relocation program.

Mrs. King's claim of ownership of the bed of the street in front of her building is based on Code (1966 Repl. Vol.), Art. 21, § 107, providing that all conveyances of land binding on a street shall be construed to pass to the grantee all the right, title and interest of the grantor to the center of the street unless expressly reserved by the grantor, and the fact that Rockville sought to condemn as well as her property "all the right, title and interest, if any, * * * in any street * * * on which the above-described property is located * * *." Rockville intended to utilize the street as part of a tract of land to be sold to a private developer and Mrs. King's claim extends to the value of the square footage of half the road in front of her property at $4.25 a square foot, the value all the appraisers, whether for Rockville or Mrs. King, put on her land.

It is to be noted that Rockville did not allege that Mrs. King had an interest in the street but only made allegations which would permit it to acquire whatever interest she had, if any. Rockville did not prove that Mrs. King had any such interest nor did Mrs. King. On the contrary, the record includes a letter from one of Mrs. King's real estate experts, filed with his deposition, which contained the following: "The City Plat of record indicates that 7.5 feet along the front of the subject property was deeded to the Mayor and Council of the City of Rockville * * *." We were informed at the argument that several years before the condemnation the late Mr. King and Mrs. King had deeded to Rockville in fee, without reservation, a strip seven and a half feet wide running parallel to the street and between it and the King property for the construction of a sidewalk. In her reply brief, Mrs. King quotes the appraiser's letter and attempts to explain it away by saying: "It is clear that the appraiser is referring to a right-of-way or sidewalk along the public street involved in this case and that the Appellant has not given up title to the street itself, nor to the land beneath the sidewalk."

It is not as clear to us as Mrs. King says it is to her, but if we take the position that it was not satisfactorily proven that Mrs. King was not an owner of land abutting the street, she is not helped. If we assume that Mrs. King owned the naked fee in half the bed of the street for the length of her abutting land, that ownership had no substantial value as of the date of the condemnation, the controlling date. Her basis for assigning value to the interest she claims in the street is that under the urban renewal plan the street would eventually be closed and used as part of a tract of land to be sold to a private developer. (We were told at the argument that Mrs. King's real estate expert would assign no value to her interest in the bed of the street as long as it remained a street.) The law is plainly established to be that fair market value of property condemned does not include or take into account any increment in value proximately caused by the public project for which the property is being taken. *Big Pool v. State Roads Comm'n,* 245 Md. 108; *Brinsfield v. Baltimore City,* 236 Md. 66; 3 *Nichols on Eminent Domain* (3rd Ed. 1965), § 8.61; 4 *op. cit.* § 12.21; Code (1967 Repl. Vol.), Art. 33A, § 6.

The evidence is that there was no likelihood whatever that the street would not continue indefinitely to be used as a street were it not for the urban renewal plan, and as long as it continued as a street Mrs. King's interest in it had no substantial value, but only nominal value. 4 *Nichols on Eminent Domain* (3rd Ed. 1965), § 12.411; *In re Public Beach, Borough of Queens, City of New York,* 199 N. E. 5, 6 (N. Y. 1935) ; *State v. Myers,* 383 P. 2d 274 (N. Mex. 1963) ; *M. & C. C. of Balto. v. United States,* 147 F. 2d 786, 789-90 (4th Cir. 1945) ; *Moale v. M. & C. C. of Balto.,* 5 Md. 314; *McCormick v. M. & C. C. of Balto.,* 45 Md. 512; *M. & C. C. of Balto. v. Frick,* 82 Md. 77.

Mrs. King has no just reason to complain that she received no award for the value of her claimed ownership in half the bed of the street on which her property fronted and therefore suffered no prejudice requiring reversal by reason of the trial court's rulings in regard to such alleged ownership.

*Judgment affirmed, with costs.*