HERITAGE REALTY, INC., ET AL. *v.* MAYOR
AND CITY COUNCIL OF BALTI-
MORE, ET AL.

[No. 112, September Term, 1968.]

*Decided January 9, 1969.*

· The cause was argued before HAMMOND, C. J., and MARBURY, McWILLIAMS, SINGLEY and SMITH, JJ.

*Joseph S. Kaufman* and *Herbert M. Brune* for appellants.

*Clayton A. Dietrich, Chief Assistant City Solicitor,* and *Thomas P. Perkins, III,* with whom were *George L. Russell, Jr., City Solicitor,* and *Richard W. Emory* on the brief, for appellees.

SINGLEY, J., delivered the opinion of the Court.

A ground rent, while not entirely unknown elsewhere in Maryland [1] and in other states,[2] is almost as peculiar to the City of Baltimore as the espantoon.[3] The legal characteristics—which are both atypical and indigenous—of Baltimore ground rents have been the subject of extensive consideration by Judge Frank A. Kaufman, *The Maryland Ground Rent—Mysterious But Beneficial,* 5 Md. L. Rev. 1 (1940) and by Mayer, *Ground Rents in Maryland* (1883).

Starting in about 1750, owners of fee simple property commenced to lease building sites to persons who would undertake the construction of improvements on the lots. From the outset, the leases were essentially identical in form and usually were for a term of 99 years, renewable forever at the option of the lessee. The payment of taxes and of other public charges was made the responsibility of the lessee by covenant. The annual rent reserved was small, usually an amount which, if capitalized at a reasonable rate of interest, represented what was conceived to be the value of the land. Since the rent was categorized as a rent *service,* the remedy of distraint was available to the lessor. *Ehrman v. Mayer,* 57 Md. 612 (1882). The lessor also had a right to re-enter in the event that the rent was six months in arrears. 4 George II, Chapter 28, recodified by Chapter 346, Laws of 1872, Maryland Code (1957, 1965 Repl. Vol.) Art. 75, § 27; *Campbell v. Shipley,* 41 Md. 81 (1874).

The legal origins of such arrangements are uncertain. Certainly of some significance is the fact that the charter [4] granted to Lord Baltimore provided that the statute of *quia emptores*

---

1. Anderson v. Susquehanna Power Co., 162 Md. 501, 160 A. 286 (1932) involves ground rents in the town of Port Deposit.

2. Cadwalader, *Ground Rents in Pennsylvania* (1879).

3. "Espantoon: a. A spontoon, b. Baltimore, U. S. a policeman's club"—Webster's New International Dictionary (2d Ed. 1961).

4. "* * * the Statute made in the Parliament of Lord EDWARD, son of King HENRY, late King of *England,* our Progenitor, commonly called the "STATUTE QUIA EMPTORES TERRARUM," heretofore published in our Kingdom of *England,* or any other Statute, Act, Ordinance, Usage, Law or Custom, or any other Thing, Cause or Matter, to the contrary thereof, heretofore had, done, published, ordained or provided to the contrary thereof notwith-

18 Edw. I c 1 (1290), which had originally been enacted to prevent subinfeudation, should not apply to the lord proprietor and his immediate grantees,[5] and that from the early days of the colony, the proprietor granted manors in fee, sometimes reserving quit rents in perpetuity and sometimes for 99 years without provision for renewal. Others have traced the origin of the leases to agricultural tenancies in Ireland.[6] Those leases had avoided *quia emptores* by being for stipulated terms, usually 99 years, which at the time represented three lives, and were renewable.

As the years passed the whole ground rent system acquired a gloss under statutory provisions and to a lesser extent from custom and case law. This Court first dealt directly with a lease creating a ground rent in *Banks v. Haskie,* 45 Md. 207 (1876), involving a lease dated 18 January 1772 by which a quarter-acre lot had been leased for an annual rent of L2 10s. As the 99 year terms of the leases which had been entered into in the last years of the eighteenth century commenced to expire, the Court began to hear cases which offered opportunity to refine further the nature of the relationship created by the leases.

The leasehold interest was recognized as personal property, *Craig v. Craig,* 140 Md. 322, 117 A. 756 (1922) and cases there cited, although it had to be conveyed like realty, *Bratt v. Bratt,* 21 Md. 578 (1864) ; Code (1957, 1966 Repl. Vol., 1968 Cum. Supp.) Art. 21, § 1. The interest of the owner of the reversion had long been held to be an interest in real property. *Myers v. Silljacks,* 58 Md. 319 (1882) ; *Coombs v. Jordan,* 3 Bland 284, 22 Am. Dec. 236 (1831). The holder of a mortgage on the leasehold could be held responsible for the payment of the rent and taxes, whether or not he foreclosed. *Williams v. Safe Deposit and Trust Co.,* 167 Md. 499, 175 A. 331 (1934) ;

---

standing." (Emphasis in original) Charter of Maryland, June 20, 1632, Art. XVIII, *Maryland Manual* (1967-68) at 588; 3 Thorpe, *American Charters, Constitutions and Organic Laws* (1909) at 1677.

5. Chesnut, *The Effect of Quia Emptores on Pennsylvania and Maryland Ground Rents,* 91 U. of Pa. L. Rev. 137 (1942).

6. *See,* for example, *Myers v. Silljacks,* 58 Md. 319 (1882) and *Banks v. Haskie,* 45 Md. 207 (1876).

*Mayhew v. Hardesty,* 8 Md. 479 (1855). Fluctuations in the value of the property inured to the benefit of the owner of the leasehold or conversely worked to his detriment. *Whiting-Middleton Const. Co. v. Preston,* 121 Md. 210, 88 A. 110 (1913); *Mayor & C. C. of Balto. v. Canton Co.,* 63 Md. 218 (1885); *Banks v. Haskie, supra.* So long as the covenants contained in the lease were observed, the leaseholder was the substantial owner of the property, *Holland v. Mayor & C. C. of Balto.,* 11 Md. 186 (1857) and his interest was perpetual. *Mayor & C. C. of Balto. v. Latrobe,* 101 Md. 621, 624, 61 A. 203 (1905).

For more than a century there was no way in which the leasehold owner could absolve himself of the necessity of paying the rent in the absence of appropriate provisions in the lease. Commencing in 1884, however, by a series of statutes which were only prospective in their operation, *Trustees of Sheppard & Enoch Pratt Hosp. v. Swift & Co.,* 178 Md. 200, 13 A. 2d 174 (1940), ground rents were made redeemable at the option of the leasehold owner; but redemption could not, and to this day cannot be exacted by the owner of the reversion. By Chapter 485 of the Laws of 1884, Code (1957, 1966 Repl. Vol.) Art. 21, § 103, leases made on and after 8 April 1884 for a term of more than 15 years could be redeemed at any time after the expiration of 15 years by the payment of an amount computed by capitalizing the annual rent at a rate of six per cent, unless some other rate, not exceeding four per cent, was stipulated in the lease. Chapter 395 of the Laws of 1888, Code Art. 21, § 103 reduced the period during which redemption could not be effected to 10 years with respect to leases made after 5 April 1888, fixed the rate of capitalization at not more than six per cent, but required six months' notice. Chapter 207 of the Laws of 1900, Code Art. 21, § 104, effective 5 April 1900, reduced the period during which a rent could not be redeemed to five years, fixed the notice period at one month, and left the six per cent rate unchanged. As a result, ground rents created prior to 8 April 1884 are irredeemable unless the lease creating them provides otherwise; ground rents created between 8 April 1884 and 5 April 1888, and between 6 April 1888 and 5 April 1900 are redeemable in the manner provided by the applicable statute; and rents created after 5 April 1900 are subject to re-

demption at the option of the leaseholder on one month's notice at a capitalization rate not to exceed six per cent.

It is in the context of this historical background that the controversy before us must be viewed. The appellants, who are 11 individuals and corporations (the Owners) owning both irredeemable and redeemable reversions in Baltimore, sought declaratory relief in the Circuit Court of Baltimore City against Mayor and City Council of Baltimore (the City), by filing a petition alleging that the City, in the course of acquiring property for public purposes, had adopted a procedure which was not only invalid, but was depriving the Owners of their property without just compensation. The City answered, as did Housing Authority of Baltimore City, which had been granted leave to intervene.

The practice of which the Owners complain is essentially this: The City, once it takes title to leaseholds subject to redeemable ground rents, is acquiring the reversions through negotiated purchase in lieu of condemnation, or by condemnation, rather than by exercising the right of redemption provided for by the lease and by statute. The whole point, of course, is that in a period when interest rates are high, the rents have a market value less than the amount which a leaseholder not having the power of condemnation would be required to pay to extinguish the rent by redeeming it at a capitalization of six per cent.

That the reverse of this situation may also be true was observed in *Mayor & C. C. of Balto. v. Latrobe,* 101 Md. 621, 61 A. 203 (1905) when the Court, speaking through Judge Boyd, said at 629:

> "* * * We cannot close our eyes to the fact, which is frequently before us, that ground rents, especially in Baltimore City, are constantly being sold and have market values (resembling somewhat those of bonds and stocks), depending upon the manner in which they are secured and the length of time they are to continue. As under our system the taxes are paid by the owner of the leasehold interest, when well secured they are in demand and frequently realize prices far beyond

what they could have been capitalized at when the leases were originally made."

Judge Boyd, in this case, was speaking of irredeemable rents, but redeemable rents can fluctuate in value, too, depending on market conditions. James F. Miller, who testified below as an expert for the City, pointed out that in the period 1945-1950, top quality redeemable rents sold on a six per cent basis, or even at prices in excess of redemption value, while less desirable rents sold at rates of between eight and twelve per cent. By about 1960, first quality redeemable rents were selling at a capitalization of seven to seven and one-half per cent, while the lower level of the market was in the eight to fifteen per cent range. It was this change which caused the City to acquire reversions by purchase or condemnation rather than by redemption.

The Owners would have us reverse the declaratory decree upholding the procedure followed by the City and dismissing their petition. The thrust of the Owners' argument is that a reversion is a first lien on the property, superior to that of any mortgage, the amount of the lien being fixed, in the case of a redeemable rent, by the redemption formula contained in the lease or ordained by statute. In the case of an irredeemable rent, the Owners say, the amount may be fixed by adopting a figure obtained by capitalizing the rent at the six per cent rate used in the statute. It is the Owners' argument that to permit the City, as leasehold owner, to acquire the reversion in any manner save by redemption, is an unconstitutional abrogation of the rights vested in the reversioner by contract.

The Owners place their principal reliance on cases which analogize the interest of the reversioner to that of a mortgagee, citing *Jones v. Magruder,* 42 F. Supp. 193 (D. Md. 1941); *Whiting-Middleton Const. Co. v. Preston, supra; Mayor & C. C. of Balto. v. Canton Co., supra; Posner v. Bayless,* 59 Md. 56 (1882) as well as on the manner in which ground rent payments have been treated for federal income tax purposes, §§ 163, 1055 Internal Revenue Code, where a ground rent paid is treated as mortgage interest and the reversion is "treated as being in the nature of a mortgage." *See also, Kaufman v. Com-*

*missioner,* 372 F. 2d 789 (4th Cir. 1966) ; *Welsh Homes, Inc. v. Commissioner,* 279 F. 2d 391 (4th Cir. 1960) ; *Commissioner v. Simmers' Estate,* 231 F. 2d 909 (4th Cir. 1956). We think this reliance is misplaced, when we take into account the peculiarities of the legal rights of the reversioner on the one hand, and those of the leaseholder on the other, and consider the difficulties that have confronted courts when an attempt is made to articulate these rights in language meangingful to persons other than skilled conveyancers or legal historians.

While it is quite true that the texts and the cases have compared a ground rent to a mortgage, the comparison is frequently qualified by pointing out that the reversion is "in effect a mortgage without a due date — a mortgage whose principal need never be paid—* * *", Kaufman, *supra,* 5 Md. L. Rev. at 47, or is comparable to a mortgage "where the principal never matures so long as the mortgagor pays the interest and taxes", *Jones v. Magruder, supra,* 42 F. Supp. at 196, or is "analogous to an [investment] secured by a mortgage," *Mayor & C. C. of Balto. v. Canton, Co., supra,* 63 Md. at 237 ; *Whiting-Middleton Const. Co. v. Preston, supra,* 121 Md. at 216.

The analogy stops short, as it must, of equating a reversion to a mortgage in all respects. A mortgage secures a debt of a specified sum, the mortgagor binding himself to pay at some definite future date. The leasehold owner's obligation is of a different sort, whether the rent to which his property is subject be irredeemable or redeemable. If he has acquired title by assignment he is obligated to pay the annual rent and taxes—but only so long as he owns the leasehold and is bound by privity of estate. If he fails to do so, the reversioner can re-enter and take possession of the leasehold. The original lessee is forever bound by covenant, however, whether he owns the leasehold or not. *Consumers' Ice Co. v. Bixler & Co.,* 84 Md. 437, 35 A. 1086 (1896) ; *Hintze v. Thomas,* 7 Md. 346 (1855). If the rent to which the interest is subject is irredeemable, the leasehold owner cannot acquire the reversion, and thus extinguish the rent, unless the reversioner agrees to sell. If the rent is redeemable, the leasehold owner may redeem if he wishes, but cannot be required to do so. *Commissioner v. Simmers' Estate, supra.* His right of redemption is like a continuing option, entitling him, if he

holds under a lease executed after 5 April 1900, to acquire the fee after five years from the date of the lease for a fixed sum. *Holzman v. Wager,*[7] 114 Md. 322 at 333, 79 A. 205 (1911); Kaufman, *supra,* 5 Md. L. Rev. 47.

The Owners would have us hold that the City, once it acquires the leasehold, is bound to exercise this option to redeem and is barred from acquiring the reversionary interest by negotiation or condemnation. The Supreme Court of Pennsylvania was faced with a similar contention in *Lock Haven Bridge Co. v. Clinton County,* 157 Pa. 379, 27 A. 726 (1893). The reasoning of that opinion is peculiarly apposite here:

> "* * * It was strenuously contended that under section 13 of the act of 1850 incorporating plaintiff company, the proposed testimony embraced in the offers recited in the first two specifications was both competent and relevant. That section provides as follows: 'At any time after the expiration of twenty years from the time of completing said bridge it shall be lawful for the commonwealth to purchase the same by paying to the said company a sum of money, which, together with the dividends declared, shall equal the cost of constructing said bridge and ten per centum per annum interest thereon.' It is claimed that this provision has all the force and effect of a contract between the company and the commonwealth, and furnishes the only measure of the damages or compensation to which the company is entitled for its bridge property and franchise, whether the same be taken for public use under the right of eminent domain, or purchased by the commonwealth in the manner above specified. The very able and ingenious argument of learned counsel in support of this position has failed to convince us that the legislature ever intended to thus surrender or barter away the right of eminent domain, and substitute in lieu thereof the provision above quoted. In the first place, it was powerless to do so; but assuming,

---

7. Holzman v. Wager incorrectly interprets Chapter 207 of the Laws of 1900 as permitting redemption after *ten* years.

for argument's sake, that it possessed the power, it did not attempt to exercise it. To hold otherwise would involve a strained construction of the language employed, and convert a mere reservation of the privilege of purchasing the company's bridge, etc., after the lapse of 20 years, and on specified terms, into an implied contract on the part of the commonwealth that the property should never be taken for public use in any other way or upon any other terms than those stated in the section. That would be doing great violence, not only to established rules of construction in such cases, but also to the language of the section itself. Charters are to be construed most strongly against the grantees and in favor of the public. They are to be strictly construed, because in every such case the just presumption is that the commonwealth has granted in express terms all that she intended to give. Mills, Em. Dom. §§ 39, 40, 489, 490; Cooley, Const. Lim. 488; 6 Amer. & Eng. Enc. Law, 522; *Pennsylvania R. Co. v. Canal Com'rs*, 21 Pa. St. 22; *State v. Commissioner of Railroad Tax'n*, 37 N. J. Law, 239; *Backus v. Lebanon*, 11 N. H. 19; *Charles River Bridge v. Warren Bridge*, 11 Pet. 420. In *Backus v. Lebanon*, supra, Mr. Chief Justice Parker said: 'Nor does the provision of the charter by which the legislature reserved the right to purchase the property with the consent of the corporation (given through their acceptance of the charter) prove, by any means, that the right of eminent domain was thereby surrendered, even if the legislature might be supposed to possess the power to make such surrender. That provides a mode by which the government might, after a certain period, come into the possession of all the property of the corporation, and a mode which could not have existed but for the provision in the charter itself. But this reservation does not seem to us to imply, in any manner, a relinquishment of any right by which the property of the corporation, or a part of it, might be taken for public use.' "

Since the owner of a leasehold interest cannot be compelled

to redeem the rent which he is required to pay, his contractual obligation to the owner of the reversion is limited to the payment of the rent and taxes. If the owner of the reversion determines to dispose of it, he can seek a buyer in the market place, and the value of the reversion will be the price at which a buyer, willing but not obligated to buy, is ready to pay, and a seller, willing but not obligated to sell, is prepared to accept. The owner is entitled to receive fair market value on condemnation, Maryland Code (1957, 1967 Repl. Vol.) Art. 33 A, § 5; *Brinsfield v. Mayor & C. C. of Balto.*, 236 Md. 66, 202 A. 2d 335 (1964), and the statute adopts the willing-buyer-willing-seller definition, Code Art. 33 A, § 6, excluding, however, any increment or diminution in value caused by the project. *Mayor & C. C. of Balto. v. United Stores, Inc.*, 250 Md. 361, 243 A. 2d 521 (1968); *King v. Mayor and Council of Rockville*, 249 Md. 243, 238 A. 2d 898 (1968), Judge Boyd, speaking for the Court in *Mayor & C. C. of Balto. v. Latrobe, supra*, said:

> "The reversioner [when his interest is condemned] is undoubtedly entitled to what his interest is worth in the market and *prima facie* the leasehold is charged with that value. Of course we are aware that the market value may vary according to the conditions of the money market and other circumstances, but so will the leasehold interest vary and the jury must be governed by the values of each, at the time." 101 Md. at 632.

The redemption price which a leasehold owner, not having the power of eminent domain, may be required to pay under the terms of his lease or by statute is no more conclusive of the value of the reversion than would be the price fixed in any option to purchase, where the option is currently exercisable but has not been exercised.

The final point made by the Owners is that the leaseholder and the reversioner should be joined in the same condemnation proceeding in order to assure that the sum of the awards shall be the full value of the property taken. *Gluck v. Mayor & C. C. of Balto.*, 81 Md. 315, 321, 32 A. 515 (1895). We do not propose to question the rationale of *Gluck*, which we read as au-

thority for the proposition that the holder of each interest has a constitutional right to be fully compensated by the condemning authority, and cannot be driven to seek redress from some other party. *See also, Sholom, Inc. v. State Roads Commission,* 246 Md. 688, 229 A. 2d 576 (1967) ; *Mayor & C. C. of Balto. v. Gamse,* 132 Md. 290, 104 A. 429 (1918). If the City embarks on a policy of piecemeal taking, *i.e.,* the acquisition of the leasehold by negotiation and of the reversion by condemnation, or vice versa, or the immediate acquisition of one interest and the acquisition of the other at a later date, which it has the right to do so long as there is no abuse of its power, *Riden v. Phila. B. & W. R. R. Co.,* 182 Md. 336, 345, 35 A. 2d 99 (1943) ; *Brack v. Mayor & C. C. of Balto.,* 128 Md. 430, 97 A. 548 (1916), it may well be that the total cost to the City will be a sum which in the aggregate is greater than the value of the property. Such a result was clearly forecast by our predecessors in *Mayor & C. C. of Balto. v. Latrobe, supra,* 101 Md. at 631, and found unobjectionable :

> "* * * We say that because each is entitled under the Constitution to be compensated in damages for the amount of his interest taken, and if it be true that the values of the two interests are more than what the lots would be worth, if owned by one person, the necessities of the case require an apparent exception to the general rule announced above [that the sum of the values of the part interests should equal the value of the whole] as to what the condemning party must pay."

*Compare, U. S. v. Certain Parcels of Land,* 43 F. Supp. 687 (D. Md. 1942).

We find no error in the result reached by the chancellor.

*Decree affirmed; costs to be paid by appellants.*